**Simon Barth**, MA Bar No. 706122, DC Bar No. 90035761
**James E. Evans**, VA Bar No. 83866
**Federal Trade Commission**
600 Pennsylvania Ave., NW, Mailstop CC-6316/1144
Washington, DC 20580
(202) 326-3317 / sbarth@ftc.gov
(202) 326-2026 / james.evans@ftc.gov

**Attorneys for Plaintiff**
**Federal Trade Commission**

**Aaron D. Ford**, Attorney General
**Ernest D. Figueroa**, Consumer Advocate

**Ziwei Zheng**, NV Bar No. 16351
**Samantha B. Feeley**, NV Bar No. 14034
**State of Nevada, Office of the Attorney General**
Bureau of Consumer Protection
8945 W. Russell Road, Suite 204
Las Vegas, NV 89148
(702) 486-6021 / zzheng@ag.nv.gov
(702) 486-3789 / sfeeley@ag.nv.gov

**Attorneys for Plaintiff**
**State of Nevada**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

|  |  |
|---|---|
| **Federal Trade Commission**, and <br><br> **State of Nevada**, <br><br> Plaintiffs, <br><br> v. <br><br> **American Tax Service LLC, et al.**, <br><br> Defendants. | No. 2:25-cv-1894-GMN-EJY <br><br> **Plaintiffs' Supplemental Memorandum in Support of a Preliminary Injunction** |

# TABLE OF CONTENTS

I.    ATS Deceives Consumers for the Benefit of Selb and Bennett ............................................. 5

    A.    Further Evidence of the ATS Enterprise's Tax Debt Relief Scam ......................... 8

        1.    Defendants' Government-Impersonating Mailers ......................................... 8

        2.    Defendants' Deceptive Sales Calls ................................................................... 12

        3.    Defendants Fail to Deliver on Tax Debt Relief Promises ......................... 14

    B.    Further Evidence of Selb and Bennett's Individual Liability ................................. 14

II.   Argument: Entering a Preliminary Injunction is Necessary and Proper ........................... 16

    A.    Plaintiffs Are Likely to Succeed on the Merits and the Balance of the
          Equities Strongly Favors the Public Interest ............................................................ 16

    B.    Continuing Conduct Relief is Necessary to Prevent Further Consumer Harm ........ 19

    C.    Continuing the Asset Freeze is Necessary and Proper ............................................ 19

        1.    The Court Has the Authority to Sustain the Asset Freeze ......................... 20

        2.    The Asset Freeze is Necessary ....................................................................... 21

        3.    The Individual Defendants are Not Entitled to Payment of
              Ordinary Expenses and Legal Fees .............................................................. 23

    D.    Continuing the Receivership is Necessary and Proper .......................................... 24

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*FTC v. American Tax Relief, LLC*, No. 11-cv-6397, 2012 WL 8281726
 (C.D. Cal. Apr. 19, 2012) ...........................................................................................23

*FTC v. AMG Servs., Inc.*, No. 2:12-cv-536, 2016 WL 1275612, at *2 (D. Nev. Mar. 31,
 2016) ...........................................................................................................16, 20, 22

*FTC v. Consumer Defense LLC*, No. 2:18-cv-30 (D. Nev. Jan. 10, 2018) ......................21-22

*FTC v. Crittenden*, 823 F. Supp. 699 (C.D. Cal. 1993).......................................................23

*FTC v. Dayton Fam. Prods.*, No. 2:97-cv-750, 2016 WL 1047353 (D. Nev. Mar. 16, 2016) .............22

*FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 632 (6th Cir. 2014) .................................12

*FTC v. Figgie International, Inc.*, 994 F.2d 595 (9th Cir. 1993)................................5, 21-22

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) ...................................................20

*FTC v. J.K. Publications, Inc.*, No. 99-cv-44, 2001 WL 36086354 (C.D. Cal. Jan. 17, 2001) .............23

*FTC v. Johnson*, 96 F. Supp. 3d 1110 (9th Cir. 2015) .......................................................17

*FTC v. NHS Systems, Inc.*, 708 F. Supp. 2d 456 (E.D. Pa. 2009)......................................21

*FTC v. Noland*, No. 20-cv-47, 2021 WL 4318466 (D. Ariz. Sept. 23, 2021) ...................20

*FTC v. Noland*, 672 F. Supp. 3d 721 (D. Ariz. May 11, 2023) .........................................24

*FTC v. OMICS Group Inc.*, 374 F. Supp. 3d 994 (D. Nev. 2019) ...............................21-22

*FTC v. Publishers Bus. Servs., Inc.*, 821 F. Supp. 2d 1205, 1223 (D. Nev. 2010) .............12

*FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997) ..........................15

*FTC v. Sharp*, No. 89-cv-870, 1991 WL 214076 (D. Nev. July 23, 1991) .......................23

*FTC v. Simple Health Plans LLC*, 58 F.4th 1322 (11th Cir. 2023)....................................24

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009)..............................................................17

*FTC v. Strano*, 528 F. App'x 47 (2d Cir. 2013)................................................................21

*FTC v. Verity Int'l, Ltd.*, No. 00-cv-7422, 2001 WL 504849 (S.D.N.Y. May 14, 2001) ....................21

*FTC v. Windermere Big Win International, Inc.*, No. 98-cv-8066, 1999 WL 608715
 (N.D. Ill. Aug. 5, 1999).............................................................................................21

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989)................................18, 23

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) ...................... 20-21

*In re Focus Media Inc.*, 387 F.3d 1077 (9th Cir. 2004)...........................................................21

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009)........................................................21-22

*Locken v. Locken*, 98 Nev. 369 (1982) ......................................................................23

*Perry v. Jordan*, 111 Nev. 943 (1995) ......................................................................23

*Nationwide Tax Experts, Inc. v. Selb*, No. 20-cv-10090 (C.D. Cal. July 7, 2021) ...................................15

*Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992) .................................20

*Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988) ....................................20

*Resort Car Rental System, Inc., v. FTC*, 518 F.2d 962 (9th Cir. 1975) ..........................................17

*SEC v. Bowler*, 427 F.2d 190 (4th Cir. 1970) ..................................................................24

*SEC v. First Financial Group of Texas*, 645 F.2d 429 (5th Cir. 1981) ............................................24

**Statutes and Regulations**                                                              **Page(s)**

15 U.S.C. § 45 ...........................................................................................18

15 U.S.C. § 53    ..............................................................................16, 19, 20

15 U.S.C. § 57b............................................................................................19-21

15 U.S.C. § 6821...........................................................................................18, 20

16 C.F.R. part 310.........................................................................................18, 20

16 C.F.R. part 461.........................................................................................18, 20

Nevada Revised Statutes § 598.0915. ........................................................................18, 20

Nevada Revised Statutes § 598.0923 ........................................................................18, 20

Nevada Revised Statutes § 598.0963 ........................................................................20

# SUMMARY INDEX OF EXHIBITS

Plaintiffs submit 608 exhibits in support of a Preliminary Injunction.* In accordance with LR IA 10–3(d), Plaintiffs provide this summary exhibit index (a complete and detailed exhibit list accompanies the e-filed exhibits).

| Government Ex. Number(s) | | Exhibit / Category Description | Page Range (FTC-ATS-____) | |
|---|---|---|---|---|
| Begin | End | | Begin | End |
| **IRS, BBB, J. Hill, and Cal. Bar Exhibits Filed with Pls.' Motion for TRO** | | | | |
| 1 | 310 | Declaration of Mark W. Henderson, IRS, and IRS Exhibits (part 1) | 0001 | 0732 |
| 311 | 316 | Declaration of Rhonda Mettler, BBB, and BBB Exhibits | 0733 | 0838 |
| 317 | 324 | Declaration of Janette Hill, former ATS employee, and Hill Exhibits | 0839 | 0863 |
| 325 | 374 | Declaration of Robert Mayson, State Bar of California ("Cal. Bar") and Cal. Bar Exhibits | 0864 | 1248 |
| **Consumer Declarations Filed with Pls.' Motion for TRO** | | | | |
| | 375 | Declaration of Jeanette Alarid-Cusick, Consumer | 1249 | 1260 |
| | 376 | Declaration of Terri and Grady Avery, Consumer | 1261 | 1264 |
| | 377 | Declaration of Vicki Boser, Consumer | 1265 | 1278 |
| | 378 | Declaration of Jordan Brewster, Consumer | 1279 | 1334 |
| | 379 | Declaration of William Michael Cameron, Consumer | 1335 | 1413 |
| | 380 | Declaration of Karen Carter, Consumer | 1414 | 1487 |
| | 381 | Declaration of Betty Cheng, Consumer | 1488 | 1489 |
| | 382 | Declaration of Jill Hebbe, Consumer | 1490 | 1505 |
| | 383 | Declaration of Curtis Hunter, Consumer | 1506 | 1510 |
| | 384 | Declaration of Timothy Lacey, Consumer | 1511 | 1558 |
| | 385 | Declaration of Kim Larson, Consumer | 1559 | 1686 |
| | 386 | Declaration of Rebecca Merlino, Consumer | 1687 | 1721 |
| | 387 | Declaration of Stacey Meyer, Consumer | 1722 | 1753 |
| | 388 | Declaration of James Meyer, Consumer | 1754 | 1817 |

* Plaintiffs previously organized the exhibits in support of their Motion for TRO into ten paper volumes in compliance with L.R. IA 10–3(i). Now, pursuant to Judge Navarro's Policies and Preferences, Plaintiffs will submit exhibits electronically, organized into thematic categories rather than paper volumes.

| Government Ex. Number(s) | | Exhibit / Category Description | Page Range (FTC-ATS-____) | |
|---|---|---|---|---|
| Begin | End | | Begin | End |
| 389 | | Declaration of Diana Moore, Consumer | 1818 | 1820 |
| 390 | | Declaration of Charles Morris, Consumer | 1821 | 1832 |
| 391 | | Declaration of Michael Parker, Consumer | 1833 | 1857 |
| 392 | | Declaration of Madeleine Roux, Consumer | 1858 | 1893 |
| 393 | | Declaration of Ilene Truitt, Consumer | 1894 | 1900 |
| **FTC and State Declarations Filed with Pls.' Motion for TRO** | | | | |
| 394 | 432 | Declaration of Reeve Tyndall, FTC Senior Investigator, and Investigator Exhibits | 1901 | 2158 |
| 433 | | Declaration of Blanca Graham-Cordova, FTC Investigator | 2159 | 2164 |
| 434 | | Declaration of Roshni Agarwal, FTC Forensic Accountant | 2165 | 2173 |
| 435 | | Declaration of Elin Alm, Office of the Attorney General of North Dakota | 2174 | 2176 |
| 436 | | Declaration of Wendy Phifer, Office of the Attorney General of Wisconsin | 2177 | 2298 |
| **Immediate Access Evidence Filed Herewith** | | | | |
| 437 | 528 | Exhibits Collected in Paper from the Las Vegas Premises | 2299 | 2797 |
| 529 | 557 | Exhibits Collected in Paper from the Los Angeles Premises | 2798 | 2976 |
| 558 | 561 | Exhibits Collected Electronically from the Las Vegas Premises | 2977 | 2990 |
| 562 | 590 | Exhibits Collected Electronically from Google | 2991 | 3084 |
| 591 | 593 | Transcripts of Consumer Calls Collected from Paragh's Computer | 3085 | 3102 |
| **Additional Declarations Filed Herewith** | | | | |
| 594 | 605 | Supplemental Declaration of Reeve Tyndall, FTC Senior Investigator (authenticating GX 437–593 and 595–605), and additional Investigator Exhibits | 3103 | 3189 |
| 606 | | Declarations of James Evans, FTC Attorney | 3190 | 3191 |
| 607 | | Second Declaration of Elin Alm, Office of the Attorney General of North Dakota | 3192 | 3203 |
| 608 | | Declaration of Joshua H. Habetz, Consumer | 3204 | 3214 |

**Note on exhibits:** All exhibits cited in the Motion are referenced as "GX [exhibit number]." References include citations to relevant paragraphs by number, and to relevant page numbers in parentheticals. The 3,214 pages of exhibits are consecutively numbered.

1
2

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM
IN SUPPORT OF A PRELIMINARY INJUNCTION**

3    This case is about a purported tax debt relief enterprise that: (1) generated calls to its

4 telemarketers through mailers that impersonated government taxation authorities, and (2) made

5 egregious misrepresentations on telemarketing calls about how Defendants would protect

6 consumers from taxation authorities and reduce or eliminate consumers' tax debt. Defendants'

7 promises made to consumers in desperate need of help with tax debt induced consumers to

8 pay—or borrow—huge sums. Teams of Defendants' telemarketers specifically tasked with

9 selling "additional services" targeted consumers from whom they could extract exorbitant

10 fees—insight they gained in advance by reviewing consumers' financial records obtained under

11 the guise of providing tax-related services. When Defendants inevitably did not fulfill their

12 promises, consumers were left holding the bag as the IRS came to collect. The nightmare

13 thousands of consumers endured started with a mailer like the one on the left, below:



14
15
16
17
18
19
20
21
22
23
24
25
26    (from GX 594 ¶ 7)                    (irs.gov/pub/notices/cp504_english.pdf)

27    One of these things is not like the other. But it's not so clear at first glance. On the right

28 is a specimen of IRS Notice CP504—a real government notice about past due tax debt. On the

left is a template mailer that Greg Paragh, the Executive Vice President of Defendant ATS Tax Group, emailed to a Las Vegas print shop on October 9, 2025. GX 596 ¶¶ 5, 7 (3104-05) Paragh also attached an Excel file listing information pertaining to 79,719 consumers, with fields corresponding to the highlighted items on the template. *Id.* ¶¶ 5-7 (2-3) (3104-05). Later that day, after Paragh approved a set of exemplar mailers, the printers produced and mailed nearly 80,000 copies the mailer on the left, each personalized for a different taxpayer, with a version in Spanish on the back. *Id.* at ¶ 9(d) (3106). These mailers threatened:

> Unless payment is made to the Federal Tax Authorities [or a state] within seven (7) days of the date of this letter, further action may be taken to collect outstanding liability. To prevent action call [an 800 number registered to Defendant TNT Tax Associates] by 10/24/2025.

*Id.* at ¶ 8 (3106). With a page layout almost entirely copied from real IRS notices, and such threatening language, it's no wonder that mailers like these have driven taxpayers to call in droves. In 2025 alone, Defendants sent more than 3,376,000 government-impersonating mailers—each batch personally approved by employees of Defendants. GX 606 ¶ 14 (3191).

Thankfully for the nearly 80,000 taxpayers who likely received Defendants' most recent round of government-impersonating mailers, on October 10, 2025, Plaintiffs and the Receiver effectuated this Court's Temporary Restraining Order—entering Defendants' business premises in Las Vegas and Los Angeles, redirecting their phone lines, and sending their telemarketers home. Thanks to this Court's intervention, Defendants will not be able to sell these taxpayers on deceptive promises of tax debt resolution that will never come true.

Evidence of Defendants' pernicious use of deceptive telemarketing was abundant in Defendants' business premises. For example, Paragh's computer desktop contained a folder named "Upsell Calls," which included, among others, recordings of six calls between Defendants' telemarketers and a then-85-year-old consumer from rural Minnesota, recorded in May and June, 2024. GX 594 ¶¶ 32-33 (3118-19) On the consumer's first call, telemarketer Rick Sanchez answered, "Tax Group, this is Rick," and soon after asked, "What can I help you with, did you get a letter in the mail?" *Id.* at ¶ 34(1) (3119). Sanchez explained:

> The reason you received that letter … is a third-party marketing company

> sent you the letter[1] to let you know that the IRS has filed a tax lien against
> you and recorded it in your county. Now what that means, is that they can
> now pursue further collection actions and wage garnishment, bank
> account levies, and, in some cases, property seizures. …
>
> [O]ur firm can usually negotiate and settle these types of tax issues for
> about 10-20% of what, whatever you owe. Alright? So in this case we can
> settle with the Internal Revenue Service for … somewhere between $3600
> and $7[,000], okay, so we'll save you a lot of money. … Now our fee to
> represent you and get the settlement is $4,000.

*Id.* at ¶ 34(2)-(3) (3119). When the consumer pushed back on using a credit card, Sanchez asked:

"What's the maximum, umm, limit that you have on a credit card right now that you can use?"

*Id.* at ¶ 34(4) (3119) Later, Sanchez conferenced-in the consumer's bank to verify the balance of

his checking account. *Id.* at ¶ 34 (3119) Finally, more than 45 minutes into the call, the call ended

with Sanchez arranging for a courier to personally bring forms to the consumer to sign. *Id.* On a

June 7, 2024 call, only part of which was recorded, telemarketer Bobby Chavez told the

consumer his bank account would be debited $22,500 in additional fees. *Id.* at ¶ 35 (3120)

On June 19, 2024, ATS's "Paul Franklin"[2] called the consumer again and said:

> So the IRS right now are currently in the process of doing what's called a
> … substitute for return. … [O]nce they file these returns for you, they're
> also going to assess a huge fine on top of that. Right now … the penalties
> alone on this are going to be somewhere around $325,000. … [T]hat also
> means that right now you're in queue for a revenue officer. Now, a
> revenue officer carries a badge and a gun. And what they do is they
> actually pay a visit to your home and then they start asking a lot of
> financial questions to figure out how they can collect from you.[3]

GX 593 (3099). Franklin then reviewed some information about the consumer's 2023 taxes

obtained from the IRS, including a Form 1099-PATR documenting nearly half a million dollars

in income from an agricultural cooperative firm, *id.*—showing that Defendants were aware that

this consumer likely had substantial funds available to be expropriated. Franklin continued:

> So we're going to file immediately for revenue officer representation.
> We're also going to combat these substitute for returns, blocking the

---

[1] Of course, in reality, Defendants themselves sent the mailer.

[2] "Paul Franklin" is the "sales name" of Christopher Pollok, a telemarketer for whom Defendants have paid rent for his personal apartment. GX 444 (2335-42).

[3] The IRS ended its practice of unannounced home visits in August 2023, nearly a year before this call. *IRS ends unannounced revenue officer visits to taxpayers*, IRS (Aug. 3, 2023), irs.gov/newsroom/irs-ends-unannounced-revenue-officer-visits-to-taxpayers.

$300,000 plus in penalties alone. … [I]f we have to, we'll submit that to tax court. … [T]he petitions we're going to be filing and the coverage we're going to be giving you, we're going to be wiping out close to a half a million in penalties and interest alone. But the final billing to get us to that point, we're looking at $178,289. And that's going to get us to the finish line. … $178,289 is going to be final attorney fees ….

*Id.* (3100). The consumer seemed confused about whether this would satisfy his tax debt: "[T]hat $180,000, does that take care of all what I owe?" *Id.* (3101). Franklin replied: "That's going to take care of what we're handling as far as your tax -- all the petitions we need to file, … attorney fees and everything else. That's going to get us to the finish line. … Once we have the tax returns filed, then we're going to negotiate on that debt as well. Right? So what your final number is I don't know yet. But it's not going to be much." *Id.* (3101-02).

On two recordings dated the next day, June 20, 2024, the voice on the consumer's end of the line was clearly a different person, seemingly younger, without the hearing difficulties of the original consumer—though the person did answer to the consumer's name. GX 594 ¶ 36 (3120). Perhaps detecting this, telemarketer Chris Bell asked the consumer to validate his birthday and the last four digits of his Social Security Number. *Id.* The person responded: "Umm, no I can't. This, this stuff is going to end right now. You're under investigation. You're under investigation. This transaction's over." *Id.* Bell asked: "Okay, so the bank called you?" And the call ended. *Id.*

Unfortunately, thousands of consumers have not been as lucky in evading the harm that flows from Defendants' deceptive marketing.[4] Since February 2022, Defendants have taken in at least $77.7 million from consumers, GX 434 ¶ 10 (2172), thanks to tactics similar to those deployed against this Minnesotan: sending government-impersonating mailers to generate inbound calls, promising settlements for a fraction of consumers' tax debts, catastrophizing about what the IRS will do if consumers don't buy-in, and, most pernicious of all, singling out particularly vulnerable consumers with substantial savings to swindle.

Defendants Selb and Bennett contend that "Defendants operate a full-service tax resolution and preparation business serving thousands of clients." Opp. to Pl.'s Ex Parte Motion

---

[4] For transcripts of two other horror stories from Paragh's "Upsell Calls" folder, *see* GX 591 (3085) ($54,315 upsell) and GX 592 (3091) ($212,453 upsell).

for Temporary Restraining Order ("Opp.," Docket No. 44), at 9. This argument ignores long-standing law holding that "[t]he fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds." *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 606 (9th Cir. 1993). Every dollar that consumers paid Defendants after being induced through government-impersonating mailers and deceptive telemarketing should be returned to them.

Plaintiffs ask this Court to enter the proposed Preliminary Injunction to ensure that no one else will be hurt by Defendants' practices during the remainder of this litigation.

## I.    ATS Deceives Consumers for the Benefit of Selb and Bennett

Defendants' promise of significant relief from tax debt is a lie. Indeed, one of the first things Defendants' telemarketers tell consumers is the quintessence of Defendants' deception: "We are a firm of tax attorneys, CPAs, & Enrolled Agents.[5] We get taxes reduced and help people like you in this situation." GX 492 (2612); *accord* GX 538 (2855). But at its core, the ATS Enterprise is not a tax firm; it's a telemarketing company.[6] Defendants Selb and Bennett have structured the ATS Enterprise to extract money from consumers through deception for their own enrichment. Government-impersonating mailers target people with tax liens recorded against them. Telemarketers promise impossible outcomes to people desperate to find a way out of tax trouble, and the telemarketers charge whatever they can get. Then an undersized and overwhelmed staff responsible for fulfillment is left to try to live up to the telemarketers' representations—a mission that the evidence shows has been almost entirely unsuccessful.

Flow charts of the client experience show that everything at ATS centers (literally on the chart) around the "Upsell." GX 451 (2360). After the initial sale, filing of a power of attorney and "Case Analysis" in "Onboarding," and a "Welcome Call" in "Client Services," customers are then contacted by the "Deal Desk" for an "Upsell Consultation." *Id.* (ATS provided staff with advice on what to say when asked "Why do I need to speak to a Compliance Analyst/Upsells?" GX 455 (2370).) Next, after an "Intro Call" and the collection of supporting documents in

---

[5] But by Defendants' own count, only 9 of its 113 employees—just under 8% of its employees—actually match that description. *See* Opp. at 4.

[6] The "ATS Enterprise" refers to the Corporate Defendants, which share liability for each other's violations of law as a common enterprise. *See* TRO Motion Part II.B.3. Selb and Bennett do not contest the existence of a common enterprise in their opposition.

"Case Management," followed by "Prep Tax Returns," customers once again land at the "Deal Desk" for another "Upsell Consultation." GX 451 (2360). And this time, the telemarketers have access to customers' financial information, so they know exactly how much money they can try to extract. (ATS price lists only display *minimum* prices. *See* GX 454 (2368-69), GX 479 (2485); *see also* GX 552 (2969); GX 556 (2975); *accord* GX 317 ¶ 9 (840). The "Deal Desk" "usually brings in about **2M-\$3M each month**." GX 490 (2604) (emphasis in original).) Finally, only after two attempts at upselling comes "File Tax Returns," and then the supposed tax resolution services that the telemarketers overhyped to consumers at the outset. After that, it's time for an "Upsell Review." GX 451 (2360); *see also* GX 450 (2359); GX 489 (2603).[7]

Employee lists also show that ATS is structured principally to make sales. A list found in the Accounts Receivable office names 34 "Settlement Officer[s]," with six more people on the "Leadership Team" above them. GX 527 (2789-90).[8] Despite sounding like a professional who might settle one's tax debt, at ATS, a "Settlement Officer" is in Sales. *Id.*; GX 452 (2365). These individuals "[t]ak[e] inbound leads and follow[] up with prospects to convert them to paying clients." GX 452 (2365). The employee list notes that those 40 people report to Selb and Bennett. GX 527 (2789-91). Another 18 people on the employee list appear under "Additional Services" with titles involving the "Deal Desk," or "Retention," or are simply listed as "Upseller." *Id.* (at 2791).[9] Meanwhile, only seven employees work in "Tax Prep." *Id.* (at 2787); *accord* GX 470 (2405). Defendants' also claim to employ four attorneys, four IRS enrolled agents, and one CPA. Opp. at 9. ATS did employ "Case Management," "Onboarding," and "Customer Service," staff, but they did not do substantive tax work. *See* GX 478 (2484); GX 471 (2406-07); GX 472 (2408-11); GX 473 (2412); GX 474 (2413-14); GX 476 (2416-21); GX 477 (2422-81).[10]

---

[7] Selb and Bennett claim Plaintiffs "misunderstand[] and misstate[] the Defendants' business to this Court." Opp. at 3. On the contrary Selb and Bennett misstate their own business to the Court. Part II.B of their Opposition describes a "customer process" with a glaring omission: the constant upsells. Defendants' own documents tell a fuller story.

[8] The employee list was undated, but it must have been generated some time between May 2024 and May 2025 because it lists Pricila Gallegos as the "Corporate Controller," and she only worked at ATS during that time span. GX 594 ¶ 37 (3120).

[9] Twenty employees listed are a "Sales Opener" or "Sales Opener Manager." GX 527 (2790-91). ATS outsourced "openers" to a call center in Tijuana earlier this year. GX 594 ¶ 37 (3120).

[10] A document titled "American Tax Service Business Models" drafted by Paragh in October 2024 lays out a plan "to generate $4 million in monthly revenue." GX 449 (2353). It calls for "8-

6

1    Another sign of ATS's central focus on sales is its complicated sales and commission

2    rules. For example, the "Sales Compensation Structure" incentivizes telemarketers to sell at least

3    $15,001 per pay period to qualify for a 20% commission, a boost from 15% for those who sell

4    less. GX 437 (2299). (Though a sales roster with "Legal Name," "Sales Name," total sales, and

5    commissions suggests that most earn 20%, regardless. GX 438 (2307).) Salespeople have "48-

6    hour ownership of any prospective client," before the "Yellowline Team" can try to close a sale.

7    GX 437 (2229). If a customer misses a payment, the "Retention Department" may "pursue

8    collection" under the "Redline Rules." *Id.* Though "[t]he Retention team will not take over the

9    customer service of the captured Redline case," and "will not be responsible for answering

10   questions from dissatisfied or angry clients." *Id.* (at 2302-03). A rule on splitting commissions

11   states that the "purpose of this rule is to incentivize providing additional services to

12   longstanding cases and to proactively encourage phone engagement with older clients." GX 437

13   (2304). Similar policies are spelled out in the "Upsell Rules," GX 441 (2322-24), which were

14   printed out and taped to the wall near the "Deal Desk" in Las Vegas, GX 594 ¶ 21 (3114-16).

15   Other evidence shows how these rules have changed over time. *See* GX 505 (2659).[11]

16   Far beyond incentive payments to telemarketers, however, the bucks truly stop with Selb

17   and Bennett. Millions in bank transfers and hundreds of thousands in payroll payments have

18   already been documented. *See* GX 434 ¶ 11 (2173), GX 394 ¶ 67 (1922). New evidence further

19   demonstrates how Selb and Bennett use the ATS Enterprise as a personal piggy bank. A profit

20   and loss statement for 2024 shows a total of $815,289 for personal "TNT Expenses" (Tyler 'n'

21   Terry), including their mortgage payments, automobile expenses, and entertainment. GX 526

22   (2786); *see also* (2784) (A profit and loss statement for January to February 2025 shows $169,449

23

24   12 tax attorneys, CPAs, and enrolled agents to handle 600+ clients per month"—at least 50 to
     75 clients per professional—as well as "30-40 sales representatives … responsible for converting
     20-30 clients per month [each]." *Id.* (at 2356-57). Even accepting the unlikely proposition that so
     few professionals could handle that case load, compared to the recent employee list, GX 527
     (2787-93), ATS is short three to six professionals, while overstaffed on the sales side by at least
     18 to 28. *See also* GX 555 (2973) (discussing dealing with increased tax return burden).

26   [11] Aside from formal commissions, ATS also pays "spiffs" to telemarketers as on-the-spot
     rewards for sales. *See* GX 547 (2906-43) (listing more than 1,000 spiffs paid in just over one
27   year); GX 549 (2963) (recent spiffs); GX 496 (2632); GX 495 (2631); GX 486 (2594). A "spiff"
     is an award for a sale. *See* dictionary.cambridge.org/us/dictionary/english/spiff. ATS touts its
28   high pay for salespeople in job postings. GX 506 (2660); GX 546 (2905); *see also* GX 490 (2604).

in "TNT" expenses); GX 557 (2976). Selb and Bennett are the only people empowered to make
decisions for the ATS Enterprise. GX 594 ¶ 28 (3118). They set up the ATS Enterprise to enrich
themselves through deception, and did not stop until this Court entered the TRO. One of their
own employees labeled them a "fraud operator" in an email to them. GX 586 (3066). But they
have persisted for years—and the bank transfers, payroll, and "TNT Expenses" illustrate why:
Swindling desperate taxpayers for their last dollar has simply been too lucrative to stop.

### A.    Further Evidence of the ATS Enterprise's Tax Debt Relief Scam

#### 1.    Defendants' Government-Impersonating Mailers

Defendants anticipated this enforcement action. In an email to Bennett and others on
March 26, 2023, Selb declared: "We have been informed that the FTC is going to become
involved in direct mail not later than August 1[,] 2023. It is absolutely imperative that [ATS]
immediately launch a series of test mailers that shall not violate the FTC Rules[.]" GX 584
(3063).[12] Selb emphasized, "We have exactly 4 months to segway [sic] into lawful mailers." *Id.*
But Defendants never transitioned to lawful mailers; they continued weekly shipments of
government-impersonating mailers to consumers. From January to October 2025, Defendants
sent more than 3.3 million government-impersonating mailers, *see* GX 606 ¶ 14 (3191),
"[t]arget[ing] individuals and businesses with tax liens, levies, or garnishments." GX 449 (2356).

Contrary to what Defendants' telemarketers say, the mailers aren't sent by third-parties.
*See* GX 410, 4:3-10 (2018); GX 412 7:21-8:2 (2026); GX 524 (2742); GX 536 (2832). From the
contents to the packaging, Defendants are wholly responsible for the mailers. *See* GX 583
(3053); *see also* GX 513 (2710-15). During Plaintiffs' immediate access to Defendants' offices,
Plaintiffs found that certain offices littered with draft mailers, confirming in-house control. *E.g.*,
GX 443 (2331-34); GX 446 (2347-48); GX 483 (2585-89); GX 510 (2682); GX 511 (2683); GX
515 (2717-18); GX 517 (2724-28); GX 518 (2729-32).

Material found in Defendants' offices also confirmed that Defendants intentionally

---

[12] Selb's email came just four days after the FTC announced that it would hold an informal
hearing on its proposed rule prohibiting government impersonation. *FTC To Hold Informal
Hearing on Proposed Impersonation Rule*, FTC (Mar. 22, 2023), ftc.gov/news-events/news/press-
releases/2023/03/ftc-hold-informal-hearing-proposed-impersonation-rule; *cf.* Compl. ¶¶ 73–80
(alleging violations of that Rule, as finalized).

design their mailers to look like real government notices. Plaintiffs discovered real government forms that Defendants had marked up by hand alongside drafts of "Distraint Warrants" and "Final Demands for Payment" that Defendants have sent to consumers for years. One such markup was on real correspondence from the Social Security Administration to Defendant Selb. GX 512 (2709); *see also* GX 514 (2716); GX 516 (2719). And, in an email to a third-party graphic designer, one ATS employee described the government-impersonating mailers as, "our 'bad cop' mailers that scare people into calling and having their tax issues addressed." GX 566 (3000).

Defendants' mailers have received significant and sustained attention from government authorities. In addition to actions discussed in Plaintiffs' *Ex Parte* Motion for a Temporary Restraining Order ("TRO Motion," Docket No. 4), evidence collected at Defendants' offices revealed additional warnings to Defendants about their illegal mailers. The following is a chronology of government inquiries that Plaintiffs are now aware of:

**Arkansas.** In August 2019, the Arkansas Attorney Generals' Office wrote to ATS regarding a "solicitation addressed to an Arkansas business that is likely in violation of the Arkansas Deceptive Trade Practices Act[.] … This solicitation is concerning in a number of ways due to the indicia of an official government document, bill, or notice." GX 568 (3006). The letter demanded that ATS "cease any solicitation" in Arkansas. *Id.* (at 3007).[13]

**TIGTA.** In March 2020, the U.S. Treasury Inspector General for Tax Administration contacted Selb and requested that he describe "the action [Selb's] company has taken regarding the advertisements as it relates to the use of IRS/Treasury seals, symbols and signs (**or any other language that might mislead an individual in believing the advertisement is from the IRS/Treasury**)."[14] GX 574 (3027) (emphasis added). In his response on March 23, 2020, Selb claimed, "[i]n the coming months, we expect direct mail to represent only a very small portion of our advertising budget due to our transition into tv/radio." *Id.* (3029). This turned out to be false. Although ATS did go on to run some TV and radio ads, direct mail has

---

[13] The Arkansas Attorney General's Office sent another letter to Defendants on August 30, 2019, following up on a conversation with "Chris Baker." GX 569 (3009).

[14] This email directly refutes Paragh's claim that TIGTA's only concern was with the exact words "IRS," or "symbolism that the IRS, Federal government, or state governments used such as eagles, birds, olive trees, seals, or anything resembling those things." Opp. Ex. 6 ¶ 3.

continued to account for the majority of its advertising and marketing budget. *See* GX 394 ¶ 62
(1919-20). Indeed, in a March 10, 2024 document titled "revised marketing plan.docx," found on
Selb's hard drive and authored by the user "terry selb," Selb described mail as a "core vertical" in
ATS's marketing, and admitted that: "Mail has lawys [sic] been our backbone of the business for
better or worse." GX 558 (2977). In the document, Selb further asks:

> Why don't we have a fulltime professional who does nothing but mail? We
> have fulltime 'professionals' in [pay-per-click] (which is peanuts compared
> to 3-4 MILLION dollars a year in mail) we gladly hire SEO professionals
> who produce very little if anything and we don't hesitate to hire full time
> individuals to monitor OTHER verticals but not the one that we rely on
> the most." *Id.* (2978).

**Maryland.** In November 2020, the State of Maryland issued an administrative subpoena
to Defendant TNT Tax Associates, regarding a mailer, toll-free numbers controlled by TNT, and
"potential violations of the Maryland Consumer Protection Act." GX 588 (3076). Selb
responded: "The mailer that you have included has nothing to do with our operation as
Responsible Organization for Toll Free numbers. Our company holds and controls routing for
tollfree numbers only and has no responsibility for how they are used." GX 588 (3078).[15]

**North Dakota.** In 2021, TNT Tax Associates accepted a marketing ban in North
Dakota. TRO Motion at 2–3, 9. GX 418 (2057-63). Defendants have flouted the North Dakota
ban on multiple occasions. On March 25, 2022, the North Dakota Attorney General's office
notified Defendants that it had received another complaint regarding one of their government-
impersonating mailers. GX 607 ¶ 6, Att. B (3192-93, 3198). Bennett replied, stating, in part: "I
don't recognize the underlying advertisement as one that has ever been sent by American Tax
Solutions and when we called the number on the advertisement, it appears to be for another
company." GX 435 (2176). This response was a bald-faced lie. Plaintiffs have discovered
multiple emails and spreadsheets belonging to Paragh, showing that Defendants had used the
phone number on mailers in February 2022, the month before the letter. And, on May 2022, an
ATS employee noted that the number "was used on a previous campaign (2/22/2022) that still

---

[15] In a direct message to Selb in the same thread, Bennett said: "How many times do we need
to learn do not talk to the government. … You shouldn't have gave dude ur email, we may have
to change that info. I am not giving these f---s anything." GX 588 (3076) (expletive omitted).

has calls coming in." GX 564 (2994). So, if Bennett *had* called the number on the advertisement as he claimed to have done, he would have reached his own employees, not another company.[16]

**Wisconsin.** In 2022, American Tax Solutions paid over $328,000 to Wisconsin and was banned from marketing in the state. TRO Motion at 2–3, 7, 22–23; GX 417 (2046-56)

**California.** In January 2024, Bennett and GetATaxLawyer.com received a letter from the State Bar of California Office of Chief Trial Counsel ordering them to cease and desist their unauthorized practice of law. TRO Motion at 8, 24; GX 356 (1100-04).

**Minnesota.** In October 2024, the Minnesota Attorney General's Office issued a civil investigative demand ("CID") to American Tax Solutions. GX 594 ¶ 22 (3116); GX 603 (3141). The CID requested exemplars of each different mailer ATS had sent to Minnesotans. GX 603 (3152). ATS provided the mailer on the right, a seemingly cleaned-up mailer, as its sole exemplar in reply. GX 594 ¶ 23 (3116-17); GX 605 (3189). In its written response, ATS stated that it was "consistent with ATS's general marketing approach." GX 594 ¶ 23 (3116-17); GX 604 (3178). But there is no evidence that Defendants ever sent substantial numbers of the mailer above. And ATS's response to Minnesota failed to include exemplars of the millions of government-impersonating mailers that Defendants have used to deceive consumers for years.

**IRS.** In November 2024, Bennett provided the same cleaned-up "exemplar mailer" in

---

[16] Bennett and his co-Defendants persist in the contempt of the North Dakota settlement. Evidence produced by Defendants' printing contractor pursuant to the TRO shows that in 2025, Defendants shipped hundreds of government-impersonating mailers to North Dakota each month. GX 594, ¶ 9(c) (3106), and a supplemental AAG declaration attests to receiving a consumer complaint regarding two ATS mailers just last month. GX 607 ¶ 7 (3193).

1    response to an IRS inquiry. GX 481 (2498). In September 2024, the IRS's Office of Professional

2    Responsibility sent Bennett a letter informing him that he was suspected of misconduct and

3    requesting information. GX 480 (2486). In addition to Bennett's misleading mailer submission,

4    Bennett's response contained the false statement: "ATS is currently no longer taking new clients

5    as it is winding down its operations." GX 481 (2501).[17]

6          Ignoring more than five years of state attorney general enforcement, Defendants simply

7    embraced purported guidance from TIGTA. First, TIGTA did not give Defendants a green light

8    to send any mailers; it merely provided clear red lights. Second, it is no defense to say: "On these

9    mailers, Defendants do not explicitly represent themselves as affiliated with the IRS or any

10    government agency," and that once consumers call in, Defendants disclose that they are a private

11    company. Opp. at 9–10. In evaluating deception, "the Court considers the overall net impression

12    the representation creates." *FTC v. Publishers Bus. Servs., Inc.*, 821 F. Supp. 2d 1205, 1223 (D. Nev.

13    2010). The mailers themselves, corroborated by consumer declarations and complaints to the

14    FTC and IRS, make clear that the net impression was government sponsorship or affiliation.

15    That a telemarketer might suggest otherwise cannot cure the deception. The harm has been

16    done. "The FTC Act is violated if the first contact or interview is secured by deception, even

17    though the true facts are made known to the buyer before he enters into the contract of

18    purchase." *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 632 (6th Cir. 2014).

19          Given the mountain of evidence that Defendants are wholly responsible for sending

20    millions of government-impersonating mailers to consumers and have brazenly defied and

21    misled state and federal law enforcement at every turn, the Court should enter a preliminary

22    injunction to prevent them from injuring more consumers as this case proceeds.

23          **2.**      **Defendants' Deceptive Sales Calls**

24          Plaintiffs have also uncovered more evidence that Defendants' telemarketers rely heavily

25    on misrepresentations to sell Defendants' tax resolution services. Although Defendants claim

26    their mission is "to deliver comprehensive tax resolution and trust services specifically tailored

27

28    [17] In a separate incident, after receiving an email from the IRS official who provided declaration GX 1, Bennett wrote: "This a------ again." GX 580 (3047).

1    to the distinct needs of individuals, families, and businesses," GX 475 (2415), the scripts used by

2    their telemarketers tell a different story. Throughout Defendants' office, Plaintiffs found scores

3    of telemarketing scripts with a clear throughline also displayed on a screen on the sales floor:

4    "GET THEM DEALS AND GET THAT MONEY!!!" GX 486 (2594); *see also* GX 534 (2812).

5         As shown in consumer declarations, Defendants' telemarketers promise to resolve

6    consumers' tax debt for significantly less than what they owe. *See* TRO Motion at 3. Defendants'

7    telemarketing scripts confirm these claims. *See* Appendix A—Telemarketing Script Excerpts; GX

8    502 (2651-54); GX 509 (2680-81); GX 524 (2757); GX 508 (2671); GX 536 (2832).

9         Defendants' scripts instruct telemarketers to tell consumers they are eligible for

10   forgiveness programs or an Offer in Compromise ("OIC")—astonishingly—before any attorney,

11   CPA, or enrolled agent has reviewed their information. *See* Appendix A—Telemarketing Script

12   Excerpts; GX 492 (2614); *see also* GX 493 (2621); GX 533 (2807); GX 534 (2819); *cf.* GX 491

13   (2608); GX 534 (2812); GX 548 (2944). However, gauging a taxpayer's OIC eligibility requires

14   careful analysis of their income, expenses (actual and under IRS-allowed expense standards),

15   assets (including equity in homes and vehicles), and liabilities. *See generally* IRS Form 656.

16        Defendants told many consumer declarants that they would protect them from levies

17   and garnishments. *See* TRO Motion at 3. This promise also appears often in Defendants'

18   telemarketing scripts. *See* Appendix A—Telemarketing Script Excerpts; GX 500 (2647); GX 524

19   (2742-66); GX 504 (2657); GX 530 (2802); GX 531 (2805); GX 533 (2807); GX 534 (2812); GX

20   536 (2832). For some consumers, these false assurances left them blindsided by IRS

21   garnishments and levies. *See* GX 388 ¶¶ 23-24 (1757); GX 393 ¶¶ 7-8 (1895).

22        Defendants also gained consumer declarants' trust by inflating their credentials and

23   misrepresenting themselves as tax attorneys. GX 608 ¶ 4 (3204); *see also* TRO Motion at 3—4.

24   These misrepresentations appear in their telemarketing scripts. *See* Appendix A—Telemarketing

25   Script Excerpts; GX 524 (2743); GX 533 (2807); GX 491 (2607-11); GX 536 (2832).

26        Consumer declarants have also reported that Defendants' telemarketers use high-

27   pressure tactics and intimidation to close sales. *See* TRO Motion at 4. This is reflected in

28   Defendants' telemarketing scripts. *See* Appendix A—Telemarketing Script Excerpts; GX 530

1   (2802); GX 532 (2806); GX 534 (2812); GX 503 (2656); GX 536 (2839). Plaintiffs have also

2   found these tactics reflected in handwritten notes on telemarketers' desks. *E.g.*, GX 488 (2599-

3   2602); GX 487 (2597); GX 529 (2798). Some scripts even have stage directions explaining that

4   certain parts of the script are to increase the consumer's anxiety. GX 524 (2754-55, 2761).

5   ### 3.   Defendants Fail to Deliver on Tax Debt Relief Promises

6           On September 25, 2025, ATS's Director of Retention and Client Services, Winston

7   Parker, emailed senior ATS staff members, including Selb and Bennett, saying: "we have 3165

8   unassigned cases. This is a nightmare about to awaken." GX 575 (3031). In a follow-up email to

9   only Bennett, he clarified: "in any event, i [sic] am not refunding a dime." *Id.* These messages

10  epitomize ATS's approach to customer service and validate consumer complaints.

11          Defendants' practices drove dissatisfaction with their businesses. Defendants' offices

12  were replete with evidence of angry consumers including cancellation and refund requests. *See*

13  Appendix B—Complaint Letter Experts; GX 447 (2349-50); GX 448 (2351); GX 457 (2373); GX

14  459 (2378); GX 460 (2379); GX 461 (2380); GX 462 (2381); GX 463 (2385-86); GX 464 (2387); GX 465

15  (2388); GX 466 (2390); GX 468 (1-2) (2394-95); GX 469 (2403); GX 499 (2646); GX 550 (2964); GX

16  576 (4) (3035-36); GX 579 (4) (3044-45); GX 572 (1, 8) (3020); GX 582 (3051); GX 585 (3064-65).

17          Corroborating these complaints, one ATS employee noted: "Since February / outta a lot

18  Millions and Millions, because I get asked 20-30 times per week for refunds. Easily 250k per

19  week." GX 458 (2377). ATS's ACH payment processer also repeatedly warned ATS for months

20  that its "unauthorized" ACH return rate was too high. GX 440 (2310-2321).

21          Winston Parker predicted "a nightmare about to awaken." GX 575 (3031). Unfortunately,

22  the evidence shows that the real nightmare was consumers' experience with ATS. Defendants

23  were in possession of consumers' complaints about being misled, and ATS failing to provide the

24  services promised by ATS's telemarketers; yet Defendants did not right the ship and end their

25  illegal deceptive practices. As noted above, it was too lucrative to stop.

26  ### B.   Further Evidence of Selb and Bennett's Individual Liability

27          Selb and Bennett dismiss Plaintiffs' evidence of their individual liability as mere

28  "generalities," Opp. at 10, despite admissions from both that they "run" ATS. Answers of Selb /

1   Bennett ¶¶ 9, *Nationwide Tax Experts, Inc. v. Selb,* No. 20-cv-10090 (C.D. Cal. July 7, 2021), ECF

2   Nos. 96 & 97. Nevertheless, much additional evidence lends specificity to these admissions.

3   According to Geoff Plourde, a CPA and attorney who worked at ATS from 2018 until he was

4   fired in January 2024: "The only people who could make decisions in the company were Terry

5   and Tyler." GX 594 ¶ 28 (3118). Plourde reported directly to Bennett and Selb during most of

6   his time at ATS. *Id.* In the "Reports To" column on ATS's employee list, everyone eventually

7   reports to Selb and Bennett—who report to no one. GX 527 (2787-93). Employment offers

8   state that new salespeople "will be reporting to Terrance Selb and Tyler Bennett, our company

9   Founders and CEOs." GX 535 (2831). Selb and Bennett personally sign off on ATS expenses,

10  including consumer refunds and printing mailers. GX 443 (2331) (paying two invoices for 80,000

11  total mailers); GX 445 (2343, 2345) ("A wire MUST be sent no later than tomorrow or the client

12  will be going to the [DOJ].").[18] Defendants' telemarketing scripts instruct telemarketers to

13  "Place the client on hold and see Terry or Tyler," before quoting a price to a consumer. GX 492

14  (2614); GX 493 (2621). They also make workplace policies and communicate them to their staff.

15  GX 551 (2967-68). Bennett's business cards identify him as an officer of multiple Defendants.

16  GX 439 (2309). When Plaintiffs and the Receiver entered Selb's office, the monitor on his

17  desktop displayed a Google Account screen reading "Welcome, Chris Baker" (Selb's consumer-

18  facing alias)[19] and the monitor on the wall displayed a spreadsheet listing data on mailers from

19  July and August 2025, including the number of calls generated and the response rate. GX 594

20  ¶ 20 (3113-14). Emails document consumers' conversations with "Chris Baker," including

21  allegations of fraud. GX 590 (3082); GX 573 (3026). Selb and Bennett also communicated

22  directly with state and federal law enforcers. *See supra* Part I.A.1. The evidence is clear that Selb

23  and Bennett "participated directly in the acts or practices [of ATS and] had authority to control

24  them," and they have at least "awareness of a high probability of fraud along with an intentional

25  avoidance of the truth." *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170–71 (9th Cir. 1997).

26  Thus, they are individually liable for the ATS Enterprise's violations of law.

27  [18] This consumer is also discussed in GX 577 (3039). In an email to Bennett and Selb, Winston Parker stated: "we keep 72 k for no work done and an[] interest free 200k for years."

28  [19] GX 317 ¶ 23 (844–45); *see also* GX 436 ¶ 9–10 (2178–79)

**II.    Argument: Entering a Preliminary Injunction is Necessary and Proper**

> Under Section 13(b) of the [FTC Act], the Court may grant the FTC a
> preliminary injunction upon a proper showing that, weighing the equities
> and considering the Commission's likelihood of ultimate success, such
> action would be in the public interest. Section 13(b) of the FTC Act,
> therefore, places a lighter burden on the Commission than that imposed
> on private litigants by the traditional equity standard.

*FTC v. AMG Servs., Inc.*, No. 2:12-cv-536, 2016 WL 1275612, at *2 (D. Nev. Mar. 31, 2016)

(Navarro, J.) (cleaned up). As discussed below and in Plaintiffs' TRO Motion, Plaintiffs are likely

to succeed on the merits of their claims, the balance of the equities strongly favors the public

interest, and the additional equitable relief of an asset freeze and permanent receiver are

necessary and appropriate. *See* TRO Motion Part II.

**A.    Plaintiffs Are Likely to Succeed on the Merits and the Balance of the**
**Equities Strongly Favors the Public Interest**

Substantial evidence supported Plaintiffs' request for a TRO, and the evidence has only

become more overwhelming since. The evidence shows that Defendants' business was

permeated with deception and that ATS employees made constant misrepresentations to

consumers. Specifically, the ATS Enterprise made the following material representations:

(a) Defendants are a government entity responsible for tax collection; (b) Defendants are

affiliated with a government entity responsible for tax collection, including the IRS;

(c) Defendants will protect consumers from levies and garnishments; (d) Defendants will reduce

or eliminate consumers' tax debt; (e) Defendants will work for consumers in furtherance of

items (c) and (d); (f) Defendants have resolved tax debts for thousands of clients; and (g)

Defendants will forward some or all of consumers' payments to the IRS or relevant state tax

authority.[20] These representations were false and misleading. *See* TRO Motion Parts I.A.3 & I.B,

*supra* Part I.A.3; *see also* Compl. ¶¶ 59–103. Therefore, they are likely to mislead consumers acting

reasonably under the circumstances in a way that is material.

Selb and Bennett claim: (1) their company had positive reviews, (2) their telemarketers

---

[20] *See* TRO Motion Part I.A.1 and *supra* at 1-2 & Part I.A.1 regarding items (a)–(b), and TRO
Motion Part I.A.2 and *supra* at 2-4 & Part I.A.2 regarding items (c)–(g).

1    disclosed that Defendants are a private company, and (3) they have saved their clients between

2    $10-30 million and filed tax returns. Each of these arguments fails as a matter of law. First,

3    notwithstanding that Selb and Bennett submitted purported "Copies of Positive Reviews from

4    Customers" in support of their Opposition (Opp. Ex. 10), Plaintiffs caution that the reviews

5    may not be genuine.[21] Also, the fact that some consumers were satisfied or that few consumers

6    complained does not mean reasonable consumers were not misled, and thus does not constitute

7    a valid defense. *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1119 (9th Cir. 2015) ("The FTC is not

8    required to show that all consumers were deceived, and the existence of satisfied consumers

9    does not constitute a defense.") (citing *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009)); *Basic*

10   *Books, Inc. v. F.T.C.*, 276 F.2d 718, 721 (7th Cir. 1960) (the presence of satisfied customers, even

11   in large numbers, cannot insulate a defendant from FTC action for deceptive practices).

12        Second, Selb and Bennett claim that their telemarketers "disclose that they are a private

13   company … not government representatives"—but even if true, this is legally irrelevant. Opp.

14   at 10. It is well-settled law that a defendant is still liable for deception even if misrepresentations

15   in the initial contact are disclaimed before purchase. *Resort Car Rental System, Inc., v. FTC*, 518

16   F.2d 962, 964 (9th Cir. 1975) (defendant is liable if "it induces the first contact through

17   deception, even if the buyer later becomes fully informed before entering the contract").

18        Third, Selb and Bennett claim Defendants have "served approximately 15,000 clients and

19   saved them approximately $10 to $30 million dollars," Opp. at 6[22]—but this ignores the evidence

20

21        [21] Defendants have paid clients for positive BBB reviews. GX 565 (2995) (email receipt for
     "Visa gift cards for BBB reviews per Greg"); GX 567 (3005) (requesting that a gift card be sent
22   to a client that left a positive BBB review). Additionally, in June 2025, Trustpilot Content
     Integrity contacted Bennett to inform him that Trustpilot's fraud detection software "has
23   detected and removed some reviews of americantaxservice.com that seem to be fake." GX 560
     (2982). Plaintiffs also discovered a PDF on Paragh's desktop titled "Trustpilot-Verified-Method-
24   procces-1 (1).pdf." The document contains annotated screenshots of a TrustPilot account with
     crude instructions for obtaining an email address to invite others to leave a verified review. At
     the bottom of the page, the document's author concludes, "Just Send to me, I will create verified
25   review and the review [will] remain stick [sic] a long time thanks." *Id.* (at 2985). This document
     suggests Defendants may have been harvesting fake "verified" reviews to evade Trustpilot's
26   fraud detection software.
          [22] Selb and Bennett's assertions are not supported by any evidence beyond self-serving
27   declarations from a few of Defendants' employees. Selb and Bennett could have requested that
     the Receiver give them or their representatives access to Defendants' business premises and any
28   documents in the possession, custody or control of the Receivership Entities. *See* TRO § 12(Q)
     & (R). Apparently Selb and Bennett did not choose to avail themselves of that option.

1   that many consumers received nothing at all from Defendants, *see, e.g.*, Supp. Dec. of Receiver,

2   Stephen J. Donell ¶¶ 4—6 (Docket No. 45), and in any event, averages out to meager savings per

3   consumer compared to what Defendants promise they will do, what they charge for their

4   services, and the amount of tax debt their target clients have.[23] It's also a losing return on

5   investment considering the $77.7 million that Defendants have taken from consumers since

6   February 2022. GX 434 ¶ 10 (2172). Defendants further claim to have filed 1,200 tax returns for

7   consumers over the last year. Opp. at 9. This is irrelevant to the deception at hand. Consumers

8   were sold on promises of tax debt relief, and they paid Defendants thousands, sometimes tens

9   of thousands—and in at least a handful of cases, hundreds of thousands of dollars—toward

10  that end. That consumers may have received something of relatively nominal value, the filing of

11  tax returns, is very much beside the point. "The fraud in the selling, not the value of the thing

12  sold, is what entitles consumers in this case to full refunds." *Figgie Int'l*, 994 F.2d at 606.

13          Given the substantial evidence in support of the TRO Motion,[24] and additional evidence

14  discussed above, *supra* Sections I.A.1-3, Plaintiffs have amply demonstrated a likelihood of

15  success on the merits of proving that Defendants' business practices violate Section 5(a) of the

16  FTC Act, 15 U.S.C. § 45(a), Section 521(a) of the Gramm-Leach-Bliley Act ("GLB Act"), 15

17  U.S.C. § 6821(a), Sections 461.2(a) & (b) of the Trade Regulation Rule on Impersonation of

18  Government and Businesses ("Impersonation Rule"), 16 C.F.R. § 461.2(a) & (b), Section

19  310.3(a)(2)(iii) of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.3(a)(2)(iii), and Nevada

20  Revised Statutes ("NRS") §§ 598.0915(5), (9), and 598.0923(1)(c). *See* TRO Motion Part II.B.1.

21          In balancing the equities, "the public interest should receive greater weight" than any

22  private interest. *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 346–47 (9th Cir. 1989); *see* TRO

23  Motion Part II.B.2. Selb and Bennett raise three potentially cognizable categories of private

---

[23] Defendants target consumers who already have tax liens. The IRS's criteria for filing a Notice of Federal Tax Lien is when the debt exceeds $10,000. Internal Revenue Manual, Part 5, 5.12.2.6 (1), https://www.irs.gov/irm/part5/irm_05-012-002.

[24] Defendants incorrectly claim that Plaintiffs' factual support for their TRO Motion was limited to 19 consumer declarations, 29 BBB complaints, and one former employee declaration. Opp. at 7. Among other substantial evidence, this claim ignores FTC investigator Tyndall's declaration attesting to the 507 consumer complaints—including two from former employees—the Commission has received regarding Defendants' conduct, GX 394 ¶ 59-61 (1918-19), and the more than 300 complaints received by the IRS, GX 5-309 (18-731).

equities: (1) ATS customers, (2) ATS employees, and (3) themselves. Because ATS was permeated with fraud, as discussed above, it should remain shuttered during the pendency of the litigation. To the extent to which ATS was poised to actually perform services on behalf of its customers, Plaintiffs recognize this may impose a hardship on those customers. However, one of the Receiver's services has been to help those customers find alternatives. *See* Dec. of Receiver, Stephen J. Donell (Docket No. 34). To date, consumer feedback to the Receiver has mostly been complaints about ATS's work, or lack thereof. *See* Supp. Dec. of Receiver, Stephen J. Donell (Docket No. 45). The Receiver can also work with Defendants' employees on issues relating to salary and property. Selb and Bennett, on the other hand, masterminded a years-long fraud that extracted tens of millions from consumers for their own enrichment. Through skilled counsel, they have "meaningfully oppose[d] the Motion and the relief sought." Opp. at 11. Beyond that, their private equities deserve little to no weight. Consider, for example, the 85-year-old Minnesotan discussed above when weighing the public equities versus those of Selb and Bennett. Going forward, they can secure legitimate employment and/or borrow funds.

For the reasons discussed in Part II.A of the TRO Motion and herein, the Court should enter the proposed Preliminary Injunction to prevent Defendants from further harming consumers during the remainder of this litigation.

### B.    Continuing Conduct Relief is Necessary to Prevent Further Consumer Harm

The evidence cited in the TRO Motion and above demonstrates how Defendants' government-impersonating deceptive mailers and pernicious telemarketing misrepresentations have harmed consumers. *See* TRO Motion Parts I.A.3 & I.B, *supra* Part I.A.3. To prevent ongoing consumer injury, the proposed preliminary injunction continues prohibitions on making misrepresentations about Defendants' purported tax debt relief services. This measure simply requires Defendants to comply with the law and is squarely within the Court's injunctive authority under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

### C.    Continuing the Asset Freeze is Necessary and Proper

Since February 2022, Defendants have deceived consumers out of at least $77.7 million. GX 434 ¶ 10 (2172). Plaintiffs and the Receiver have identified only a fraction of that in assets

frozen under the TRO. GX 594 ¶ 6 (3105). Plaintiffs are likely to succeed on the merits, and at that point, consumer redress would be an appropriate remedy. Keeping Defendants' assets frozen so they will be available for such a remedy is necessary and appropriate.

### 1. The Court Has the Authority to Sustain the Asset Freeze

The Court's authority to order the asset freeze in the TRO, and to sustain it in a preliminary injunction, is well-established. "Congress thereby [in § 19 of the FTC Act] gave the district court power to order rescission of contracts. Hence § 13(b) [of the FTC Act] provides a basis for an order freezing assets." *FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982); *see Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988) (citing *H. N. Singer*); *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992) ("[an asset freeze] is authorized by the district court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief"); *FTC v. Noland*, No. 20-cv-47, 2021 WL 4318466, at *4 (D. Ariz. Sept. 23, 2021); *AMG Servs., Inc.*, 2016 WL 1275612, at *5 (Navarro, J.).

Selb and Bennett's invocation of *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), is puzzling. That case "present[ed] the question whether, *in an action for money damages*, a … Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed." *Id.* at 310 (emphasis added). But this is *not* an action for money damages. To be clear—Plaintiffs assert two theories for equitable monetary relief: (1) Defendants' violations of the GLB Act, the Impersonation Rule, and the TSR trigger equitable monetary relief under § 19 of the FTC Act, 15 U.S.C. § 57b—specifically, "rescission or reformation of contracts [and] the refund of money or return of property," and (2) Defendants' violations of NRS §§ 598.0915(5) and (9), and 598.0923(1)(c), trigger equitable monetary relief under NRS § 598.0963(3)—specifically, "disgorgement [or] restitution."[25] Plaintiffs do not seek legal damages in this action. The only remedies sought are equitable remedies.[26] Thus, *Grupo Mexicano* has no application to this case.

---

[25] The FTC's claim is subject to a three-year statute of limitations. 15 U.S.C. § 57b. The State of Nevada's claim has no time limitation. NRS § 11.245.

[26] Selb and Bennett appear to agree. They state: "[§ 19] encompasses the already-existing equitable remedies at the District Courts' disposal. … That is, the applicable statute merely

If *Grupo Mexicano* was not clear enough, Selb and Bennett cite cases that further support the conclusion that Plaintiffs' requested remedies fall outside of *Grupo Mexicano*, namely: *Johnson v. Couturier*, 572 F.3d 1067, 1083–85 (9th Cir. 2009) ("[B]y its very terms, the holding of *Grupo Mexicano* is limited to cases in which only monetary damages are sought. The Supreme Court expressly stated that a preliminary injunction barring asset transfer is available where the suit seeks equitable relief."); and *In re Focus Media Inc.*, 387 F.3d 1077, 1087 (9th Cir. 2004) ("*Grupo Mexicano* exempts from its proscription on preliminary injunctions freezing assets cases involving … equitable causes of action."). Selb and Bennett state: "In both cases … there were sufficient independent legal foundations that sustained the District Courts' equitable authority to freeze unencumbered assets, beyond merely the plaintiff pleading equitable relief." Opp. at 13. Even if that is a correct observation, neither case *required* "independent legal foundations" for an asset freeze, and both expressly acknowledge that *Grupo Mexicano* simply does not apply to cases seeking equitable relief.[27] *See also FTC v. Strano*, 528 F. App'x 47, 49 n.2 (2d Cir. 2013); *FTC v. NHS Sys., Inc.*, 708 F. Supp. 2d 456, 465 n.12 (E.D. Pa. 2009); *FTC v. Verity Int'l, Ltd.*, No. 00-cv-7422, 2001 WL 504849, at *2 (S.D.N.Y. May 14, 2001); *FTC v. Windermere Big Win Int'l, Inc.*, No. 98-cv-8066, 1999 WL 608715, at *3 n.2 (N.D. Ill. Aug. 5, 1999) (all distinguishing *Grupo Mexicano* from FTC cases seeking equitable monetary relief).

### 2.    The Asset Freeze is Necessary

Unfortunately, it is already evident that an appropriate equitable monetary judgment for consumer redress in this matter will exceed Defendants' ability to pay, based on the current amount frozen and the value of other identifiable assets. Because Defendants induced consumers to pay through deception, the appropriate figure representing "rescission or reformation of contracts [and] the refund of money or return of property" under § 19 of the FTC Act and "disgorgement [or] restitution" under NRS § 598.0963(3) is the entire amount of money Defendants brought in through that deception, less refunds already provided (a current estimate is the $77.7 million that Defendants have taken from consumers since February 2022,

restates the District Courts' existing authority to grant equitable relief." Opp. at 13.

[27] If more were needed: the frozen funds should be considered subject to a constructive trust for Defendants' victims. *See infra* Part II.C.2.

GX 434 ¶ 10 (2172)). *Figgie Int'l*, 994 F.2d at 606; *FTC v. Consumer Def., LLC*, No. 2:18-cv-30, 2022 WL 18106047, at \*4 (D. Nev. Dec. 30, 2022) ("[T]he proper monetary award here is … defendants' net revenues."); *FTC v. OMICS Grp. Inc.*, 374 F. Supp. 3d 994, 1014 (D. Nev. 2019) (Navarro, J.), *aff'd*, 827 F. App'x 653 (9th Cir. 2020). Selb and Bennett are mistaken that Defendants retain any right to "actual earnings for services provided to paying customers" when those customers were deceived at the outset of their relationship with Defendants. *Figgie Int'l*, 994 F.2d at 606; *FTC v. Dayton Fam. Prods.*, No. 2:97-cv-750, 2016 WL 1047353, at \*10 (D. Nev. Mar. 16, 2016) (Navarro, J.) ("no offset is warranted for any 'value' in the sweepstakes booklets or de minimis checks sent to some consumers, as the victims paid based on false promises about valuable monetary prizes"), *aff'd sub nom. FTC v. Burke*, 699 F. App'x 669 (9th Cir. 2017). Every dollar consumers paid Defendants after being induced to pay through government-impersonating mailers and deceptive telemarketing should be returned to them. With continued investigation, the current estimate of consumer harm is likely to go up.

Despite being "presumably more than capable of placing assets in [their] personal possession beyond the reach of a judgment" because of the sheer amount of money Selb and Bennett have extracted from the ATS Enterprise, *Johnson*, 572 F.3d at 1085; *see* GX 434 ¶ 11 (2173), GX 394 ¶ 67 (1922), Selb and Bennett argue that Plaintiffs have not offered evidence of a likelihood of dissipation specific to them. That is not correct. The pipeline of money from consumers to ATS to Selb and Bennett to fund their lavish lifestyles *is* dissipation. This Court found evidence of dissipation when defendants "wr[ote] thousands of checks to their wholly owned companies and us[ed] corporate assets for personal expenditures." *AMG Servs.*, 2016 WL 1275612, at \*5. Selb and Bennett are different only in that they skipped the wholly owned companies and paid themselves directly. GX 434 ¶ 11 (2173), GX 394 ¶ 67 (1922). The risk of dissipation is obvious: If the assets are unfrozen, Defendants will spend them, as they have done with much of the rest of the consumer money they've paid themselves over the years. Selb and Bennett's Opposition itself requests funds be unfrozen to pay expenses and legal fees—thereby dissipating the funds available for redress. Given that Defendants extracted tens of millions from consumers through deception, and only a fraction of that is still available to help return

1  consumers to the status quo ante before they were deceived, the asset freeze is absolutely

2  necessary to preserve every available dollar for Defendants' victims.[28]

3        **3.    The Individual Defendants are Not Entitled to Payment of**

4              **Ordinary Expenses and Legal Fees**

5        Selb and Bennett ask that "any preliminary injunction entered must, at minimum, allow

6  Defendants to continue paying ordinary living expenses and legal fees related to this action."

7  Opp. at 16. This appears to be a completely open-ended request for a carve-out for whatever

8  living expenses that Selb and Bennett see fit to spend money on. Given Selb and Bennett's lavish

9  lifestyles, granting this request may be tantamount to ending the asset freeze altogether. If Selb

10  and Bennett want use assets that should go to their victims, they can file a separate motion to

11  unfreeze assets: (1) itemizing their requests at the minimum level they deem absolutely necessary,

12  and (2) demonstrating why they cannot fund their expenses by other means, such as legitimate

13  employment or borrowing.[29] Plaintiffs will then determine their position on that request.

14  However, "[c]ourts regularly have frozen assets and denied attorney fees or limited the amount

15  for attorney fees." *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989); *see FTC v.*

16  *Am. Tax Relief, LLC*, No. 11-cv-6397, 2012 WL 8281726, at *1 (C.D. Cal. Apr. 19, 2012) ("This

17  Court has the duty to preserve the frozen assets to provide restitution to possible victims.");

18  *FTC v. Sharp*, No. 89-cv-870, 1991 WL 214076 (D. Nev. July 23, 1991). In any event, at this

19  stage, with no information on how much Selb and Bennett are asking, the Court should not give

20

21  [28] Moreover, to a great extent, the frozen assets aren't Defendants' assets at all—they are held in constructive trust for the benefit of Defendants' victims. *See FTC v. Crittenden*, 823 F. Supp.

22  699, 702–03 (C.D. Cal. 1993), *aff'd*, 19 F.3d 26 (9th Cir. 1994); *cf. FTC v. J.K. Publications, Inc.*, No. 99-cv-44, 2001 WL 36086354, at *12 (C.D. Cal. Jan. 17, 2001) ("A thief may not convey good

23  title, even to a bona fide purchaser."). Under Nevada law, "[a] constructive trust will arise … under circumstances where: (1) a confidential relationship exists between the parties; (2)

24  retention of legal title by the holder thereof against another would be inequitable; and (3) the existence of such a trust is essential to the effectuation of justice." *Locken v. Locken*, 98 Nev. 369,

25  372 (1982). A confidential relationship "exists when one party gains the confidence of the other and purports to act or advise with the other's interests in mind; it may exist although there is no

26  fiduciary relationship." *Perry v. Jordan*, 111 Nev. 943, 947 (1995). That is precisely the relationship between Defendants, as purported tax advisors, and their customers. But because these

27  relationships were premised on deception, it would be inequitable to allow Defendants to retain legal title over the funds they received from consumers as a result of that deception.

28  [29] The proposed Preliminary Injunction does not freeze "assets obtained by Defendants after this Order is entered" unless "those assets are derived from any activity that is the subject of the Complaint in this matter or that is prohibited by this Order." Proposed PI, at 7.

1    them carte blanche to spend money that belongs to consumers.

2        **D.    Continuing the Receivership is Necessary and Proper**

3        To date, the Receiver has played an instrumental role as this Court's agent in the

4    temporary shuttering of the Corporate Defendants' operations, the marshalling of the

5    Receivership estate's assets and records, and providing assistance to consumers, among other

6    projects. *See* Decl. of Receiver, Stephen J. Donell (Docket No. 34). This Court should continue

7    the Receivership because Plaintiffs have established that they are likely to succeed on a claim for

8    monetary relief based on Section 19 of the FTC Act and Nevada law, and the Receiver

9    continues to be necessary to preserve funds for a future monetary judgment. *See FTC v. Simple*

10   *Health Plans LLC*, 58 F.4th 1322, 1328–30 (11th Cir. 2023). The Receiver's continued

11   appointment will "prevent ongoing and future harm" to existing and prospective consumers.

12   *FTC v. Noland*, 672 F. Supp. 3d 721, 732 (D. Ariz. May 11, 2023); *see also SEC v. First Fin. Grp. of*

13   *Texas*, 645 F.2d 429, 438 (5th Cir. 1981); *SEC v. Bowler*, 427 F.2d 190, 198 (4th Cir. 1970). If

14   allowed to continue his work the Receiver will assess the extent of the fraud in Defendants'

15   business practices, trace its proceeds, prepare an accounting, and make an independent report of

16   whether Defendants business can be run lawfully and profitably to the Court. Given this

17   important role and work, the Court should sustain the Receivership.[30]

18                                    \* \* \*

19       For the foregoing reasons, Plaintiffs respectfully request that the Court enter a

20   preliminary injunction against Defendants.

21

22

23

24   [30] Defendants' arguments against continuing the Receivership are the same as their arguments against continuing the asset freeze and fail for the same reasons explained above. Alternatively, Defendants ask the Court to, "at minimum direct the Receiver to continue operating the

25   businesses, retain existing employees to complete and file customer tax returns, and ensure that paying customers receive the services for which they contracted." Opp. at 18. At present, it

26   would be in the Receiver's discretion to take on these tasks. To Plaintiffs' knowledge, the Receiver has not yet arrived at a formal conclusion about whether the business can be run

27   lawfully and profitably. The Receiver should be allowed to reach that conclusion before being ordered to restart the business. Selb and Bennett's request should be, at most, tabled until the

28   Receiver issues an official report to the Court with his conclusions.

1

Respectfully submitted,

2

Dated: October 25, 2025

3

/s/ Simon Barth

**Simon Barth**, MA Bar No. 706122,
DC Bar No. 90035761

4

**James E. Evans**, VA Bar No. 83866

5

**Federal Trade Commission**
600 Pennsylvania Ave., NW, CC-6316/1144

6

Washington, DC 20580

7

(202) 326-3317 / sbarth@ftc.gov
(202) 326-2026 / james.evans@ftc.gov

8

**Attorneys for Plaintiff**

9

**Federal Trade Commission**

10

**Ziwei Zheng**, NV Bar No. 16351

11

**Samantha B. Feeley**, NV Bar No. 14034
**Office of the Nevada Attorney General**

12

8945 W. Russell Road, Suite 204
Las Vegas, NV 89148

13

(702) 486-6021 / zzheng@ag.nv.gov
(702) 486-3789 / sfeeley@ag.nv.gov

14

15

**Attorneys for Plaintiff**
**State of Nevada**

16

17

18

19

20

21

22

23

24

25

26

27

28

25

**APPENDIX A**
**to Plaintiffs' Supplemental Memorandum in Support of a Preliminary Injunction**

**Telemarketing Script and Other ATS Document Excerpts**

| Exhibit | Selected Quotations |
| --- | --- |
| GX 487—Handwritten Script | "Case has entered high risk territory. This means collections enforcement. You're either already assigned to a revenue officer or about to be. … While you're thinking, the IRS isn't. Interest is compounding and enforcement is progressing." (2597) |
| GX 488—Handwritten Script | "The IRS is preparing to seize your income and bank accounts. They don't call ahead, they just act. The moment a levy hits, it's too late to negotiate. I get that the fee feels like a stretch but right now, but it won't feel that way when your paycheck is missing next month." (2599) |
| GX 491—Opener/Transfer Script | "We're The Tax Group. We're a nationwide, private company with four offices across the country: California, Nevada, Colorado and Texas. We have been in business for over 16 years, servicing over 20,000 clients. We're staffed with a host of Tax Attorneys, CPAs and Registered Agents." (2606) |
| GX 492—Mail Script | "Great news! We are able to help you. You appear to qualify for the Offer in Compromise program, and the attorneys say we can settle it for about, $X,XXX." (2614) |
| GX 500—Money Ball Script | The first thing we do is PROTECT clients from ANY COLLECTIONS RIGHT AWAY. (2647) |
| GX 502—Mailer Script | "The notice was sent to let you know a tax lien has been filed and the state or IRS begin additional collection action very soon. We are a firm that consists of private tax attorneys, CPAs and Enrolled Agents. We get taxes reduced and help people like you in this situation." (2651) |
| GX 503—Rebuttals | **"Send me the documents and I will look at them?** I'm sorry, we don't send blank documents. It's our firm's policy. We have license numbers and proprietary information, so there needs to be a level of trust on both sides here." (2656) |
| GX 504—Exploratory Script | Then we place an immediate 90 day collection hold, which we can always extend if we need to. That will protect you from any bank levies, wage garnishments, seizures of assets, or any other collection horror stories you hear. I can have that done by the end of the day. (2657) |

| GX 506—Job posting for Las Vegas sales rep | "Do you want to be in the six figure compensation range within 30-60 days?" (2660) |
|---|---|
| GX 508—Script | "We PROTECT clients from ANY COLLECTIONS RIGHT AWAY." (2662) |
| GX 509—Pitch | "We strategically place our clients in 1 of 5 different **IRS Approved Tax Settlement Programs,** where the client may be able to save 80 to 90% on the tax debt, and in some cases even more. … In many cases it results in 100% of forgiveness of the tax debt." (emphasis original) (2680) |
| GX 524—Telemarketing Scripts | "The letter was sent by a third party firm – one of those firms for greater government transparency." (2742) |
| | "We are a private firm of tax attorneys" (2743) |
| | "The first thing we do is PROTECT clients from ANY COLLECTIONS RIGHT AWAY" (2748) |
| | "*this is crucial - our help is not guaranteed, this is a soft take away, our help is theoretical now, and this should give the prospect a low level of anxiety*" (2754) |
| | "(*this remark is designed to create more anxiety.)" (2755) |
| | "So based on everything you've said, you're a slam dunk (or if not, 'an exceedingly strong candidate') for getting this settled. Typically, when we go in for settlements we end up settling for around 15% percent (that's 1-5%) of the total assessed debt." (2757) |
| | "(*this whole speech is designed to produce anxiety as well as make us look like late-TR-filing Navy SEALS)" (2761) |
| GX 529—Notes | "Use ~~old~~ fake client example" (2798) |
| GX 530—Script | "First is **Protection** – we make sure you and your assets are shielded from any further IRS or State action while we work your case. That means no surprise levies, garnishments, or seizures." (2802) |
| | "(if hesitant): 'Totally understand – but here's the thing: those notices move forward automatically, and |

| | |
|---|---|
| | once the IRS triggers enforcement, it's a lot harder to reverse. If we take a quick look now, I can tell you **exactly where you stand** before it escalates. Does that make sense?'" (2803) |
| GX 531—The Sale | "The first thing we need to do is get you protected. Stop the collections process and negotiate the debt." (2085) |
| GX 532—Urgency Soundbites | "We always hear about the nastiest collection action from the IRS after things have been quiet for a long stretch. That's when we see things like bank levies, wage garnishments, revenue officer visits." (2806)

"We are getting more and more distress calls from clients on payment arrangements who have had their accounts levied. And these are people that the IRS would ordinarily not have bothered with—Vietnam vets, the elderly, the handicapped, single moms, etc- it's a really scary time." (2806) |
| GX 533—Script | "We are a firm consisting of a private tax attorneys CPA's and Enrolled Agents" (2807)

"We PROTECT clients from ANY COLLECTIONS RIGHT AWAY." (2808) |
| GX 534—Team Leadership Rebuttal Sheet to the Most Common Objections | "1. I can't afford that // I have no money … What would you be able to put down today so that we can get you protected and slate you into the caseload, allocating your attorney's time towards your case?" (2812)

"2. Can you call me Friday? I don't have any money now, but I get paid on Friday. … I'm just concerned that it's such a busy time of year for us, our caseload might be full by Friday. … [T]his time of year {whatever it is – the summer, the last quarter, post-holidays, end of year} is always when we get slammed with requests." (2812)

"Part of the reason your case is so strong is because you are under marked financial strain." (2813)

"this pitch is great for when you want to sell an exploratory pitch to the client here as a **FORENSIC INVESTIGATION** for a bigger fee and more bells and whistles. ***For this pitch you quote $1100 minimum" (2826) (emphasis original) |

| GX 536—Script | "To be clear, we didn't send you that letter. An NGO // non-profit sent it to give you a courtesy FYI that this tax lien is active in your name and that typically, that's the first step in hostile collection action." (2832)

"We PROTECT clients from hostile collection action from THE UNITED STATES GOVERNMENT" (2833)

[W]e need to file a CDP hold on your Social Security number and get you protected so that if they have anything nasty in the pipeline like a garnishment or a bank levy or if they plan on sending a revenue officer to your house, it stops them dead in their tracks." (2838)

*THIS IS THE TAKEAWAY – YOU WANT TO MAKE THEM A LITTLE ANXIOUS AS THEY ARE ON HOLD (2839)

"You are a slam dunk for getting this settled. … So typically in this process, when you look at all the cases that come through our firm, our batting average as a firm is 15% - meaning we get out clients settlements of around 15%. Some clients settle for a little bit higher, closer to 20% and some of them a little bit lower, closer to 10%[.] Based on everything you've said, I think you are going to be right in the middle at 15%" (2840)

"I am with American Tax and we are a firm of tax attorneys, Enrolled agent and CPA's fix tax problems [sic]" (2846) |
| GX 546—Job Posting | "Actualmente tenemos varias personas en nuestra área de ventas de resolución de impuestos que alcanzaron más de $10,000 al mes en Comisiones dentro de los primeros 60 días y varios ganan más de $25,000 al mes." (several people in tax resolution sales have reached over $10,000 per month in commissions in the first 60 days, and several earn over $25,000 per month) (2905) |
| GX 548—Revised RVM Script | "(no matter what they say) Great, it sounds like you're eligible for an aggressive tax forgiveness program." (2944) |

**APPENDIX B**
**to Plaintiffs' Supplemental Memorandum in Support of a Preliminary Injunction**

**Complaint Letter Experts**

| Exhibit | Selected Quotations |
|---|---|
| GX 447—Complaint Letter | "I have been a Business and Financial Planner for over 35 years. This and the detail below are[] concerning a company called American Tax Services and their unethical and illegal business practices. This Disaster has been going on for 11 months …" (2349) |
| GX 448—Refund Request | "I am writing to formally demand a full refund of $2,500 paid to American Tax Service LLC, which is Despite repeated assurances, no paperwork was ever filed with the Internal Revenue Service (IRS) I have made multiple attempts to contact ATS regarding this matter, but my calls have gone unanswered." (2351) |
| GX 457—Handwritten Refund Request | "Still waiting for refund of $2500.00 originally paid on 8/12/22 to set up a trust fund that I was quoted by "Greg" to take only 2 weeks" (2373) |
| | "Where exactly did my $92,774.00 go to? Am I still being charged interest, penaltys [sic], fees? etc. by the I.R.S. I will expect something from you in way of answering my questions in a timely manner since you've taken 2 years to file 2 returns." (2374) |
| GX 458—Case Notes | "Since February / outta a lot Millions and Millions, because I get asked 20-30 times per week for refunds. Easily 250k per week." (2377) |
| GX 459—Cancellation Letter | "I am writing to officially notify you that I am terminating your services immediately. This is because I have found other representation, and I feel that I have been misled." (2378) |
| GX 460—Refund Request Letter | "I have experienced repeated issues including: Lack of communication and transparency regarding the status and direction of my case; Reassignment to at least five (5) different case managers, each requiring me to resubmit the same documentation multiple times; and Failure to receive return calls or emails despite numerous attempts to obtain updates." (2379) |
| GX 461—Handwritten Notes on ATS Correspondence | "I'm done with paying you thousands …. [A]t one point you were getting 1,700/month and I have no return filed?" (2380) |
| GX 462—Refund Request Letter | "From the beginning, there has been a consistent lack of communication, lack of transparency, lack of documented evidence of services supposedly |

| | | |
|---|---|---|
| | | provided, lack of honesty and frequent turnover in case managers. … In the beginning, I was told that once payment for your services had been received, ATS would have my account with the IRS frozen. That has yet to be fulfilled. Interest and penalties are being added to my balance due as shown on my last notice from the IRS. … I received a call from ATS stating an additional $1,000 was needed for services. I asked the caller why it was needed but was not given an explanation or answer. Automatic charges by ATS were then applied to my credit card without my permission." (2381) |
| | GX 463—Complaint Letter | "I subsequently explained to Mr Monter and Thompson that I was halting auto-payment on the account until I was assured that the case was going to be actively and properly handled, and that we had lost almost 2 mo's time due to Mr. Riley's incompetence. … I was been contacted by … a rude woman named Nicole from [the Collections Department, who] has been aggressive and unpleasant, threatening to stop work on our case if I fail to immediately pay in full.") (2385-86) |
| | GX 464—Refund Request Letter | "I paid ATS $109,000 with the expectation that you would file my past tax returns and settle my IRS debt effectively and in a timely manner. Regrettably, after several months, I have seen no progress toward this resolution and no longer trust that ATS is capable of handling my case properly. You have allegedly lost all my tax documents …. It has become evident that you do not possess the necessary knowledge to accurately file my past tax returns." (2387) |
| | GX 465—Refund Request Letter | "Your company failed to provide any of the services promised, or to take any steps on my behalf." (2388) |
| | GX 466—Demand for Return of Funds Delivered | "Your negligence was unjustified, counsel was incompetent, and you utterly failed to render the services under the agreement." (2390) |
| | GX 468—Refund Request Letter | "[An ATS employee] notified me that ATS had arranged a 60-month payment plan with the Comptroller's Office. I confirmed with the Comptroller that this was a basic plan that any taxpayer could requires directly. They advised me to apply for an Offer in Compromise (OIC), which I successfully did on my own. The OIC was acted at 50% of my total balance—again, without any involvement or assistance from ATS." (2394-95) |
| | GX 469—Refund Request Letter | "I have had a case with you for 5yrs and 7 case managers and people that hang up and don't return calls when they say they will." (2403) |
| | GX 499—Revocation Letter | "I believe you have taken an advantage of me due to my lack of English comprehension." (2646) |
| | GX 550—Demand Letter | "Mr. Ogg hired your office to resolve his tax issues |

| | |
|---|---|
| | and has paid American Tax Service, LLC also known as ATS Tax Group over $205,000.00. To date, my clients have received no benefit. Your offices failed to perform the services promised to my clients. Such failure constitutes breach of contract under Iowa law." (2964) |
| GX 572—Email from Office of IL Attorney General | "I begged you guys to return this psycho's money. But you got greedy. Now we're in trouble. It's only 3k." (3017)<br><br>"The fraud with get a tax lawyer/American tax solution works as follows. … Get-A-Tax-Lawyer/American Tax Solution fast talking salesperson willfully leads you to believe that you are communicating with an attorney or a specialist regarding the advice that they were recommending." (3024) |
| GX 576—Refund Demand Email | "ATS took my money, shined me on, eventually began to dodge me, and provided no deliverable (consideration)." (3035) |
| GX 579—Refund Demand Email | "Either you resolve this with [a consumer finance company] as well as us or we will sue you for Consumer fraud and request triple damages for what we paid that you did not delver or falsified." (3045) |
| GX 582—Email re: Cancellation Request | "Few of the reasons stated by the client: 1. No work performed, lack of benefits. 2. Communication issues, misleading sales practices. 3. Failure to file necessary documents, incorrect advice. 4. Promised services not provided, charges for non-performed tasks. 5. Demand for full refund, intention to take legal action. 6. Allegations of consumer fraud and deceptive promises." (3051) |
| GX 585—Cancellation Letter | "On or around 8/8/22, I learned that Tyler Bennett is not a lawyer and I would never have contracted with a company such as American Tax Solutions that has a spokesman who makes fraudulent misrepresentations to the public." (3064-65) |
| GX 590—Cancellation Email | "We have arrived at the end of our relationship. Your actions have proven to be negligent, deceitful, and illegal. I have copied my counsel, Brian Carlin, here to make sure the shenanigans cease. My conversation last Thursday with Chris Baker ended after I politely asked for a copy of the bill for Golden Systems, for which I paid a $35k deposit. Three full business days have elapsed, but I still have not received a bill, despite |

| | |
|---|---|
| 1 | Chris telling me that I would have it promptly on |
| 2 | Friday. I reminded him yesterday by text, to no avail. |
| 3 | That I still have not received any bill from your firm, ever, is appalling and unprofessional, to say the least. It |
| 4 | also supports my belief that you are stealing my money. It shows that you do not have back up to |
| 5 | support your claims that you have spent the entirely of the $35k deposit already." (3082) |