UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, *et al.*,<br><br>                    Plaintiffs,<br><br>   vs.<br><br>AMERICAN TAX SERVICE LLC, *et al.*,<br><br>                    Defendants. | Case No.: 2:25-cv-01894-GMN-EJY<br><br>**ORDER GRANTING, IN PART, MOTION TO MODIFY PRELIMINARY INJUNCTION** |

Pending before the Court is Defendants Tyler Bennett and Terrance Selb's Motion to Modify Preliminary Injunction Order,[1] or Alternatively Motion for Withdrawal of Counsel, (ECF No. 57). Plaintiffs Federal Trade Commission, ("FTC"), and State of Nevada filed a Response, (ECF No. 63), to which Defendants replied, (ECF No. 65). For the reasons discussed below, the Court GRANTS, in part, and DENIES, in part, Defendants' Motion to Modify Preliminary Injunction.

**I.   BACKGROUND**

This action arises out of Defendants alleged violations of Section 5(a) of the FTC Act, Section 521 of the Gramm-Leach-Bliley Act, the Trade Regulation rule on Impersonation of Government and Business, and the Telemarketing Sales Rule. (*See generally* Compl., ECF No. 1). The factual background of this case is set forth more fully in the Court's prior order entering a preliminary injunction, (ECF No. 64).

On November 20, 2025, the Court entered a preliminary injunction against Defendants. Among other things, the preliminary injunction contained the following order:

---

[1] When the Motion was filed, Defendants sought to modify the TRO. However, before briefing concluded on this motion, the Court entered a Preliminary Injunction against all Defendants. In their Reply, Defendants clarified that they now move to modify the preliminary injunction. (*See* Reply at n. 2, ECF No. 65).

It is further ordered that Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby preliminarily restrained and enjoined from:

    A. Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, relinquishing, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any assets that are: (1) owned or controlled, directly or indirectly, by any Defendant; (2) held, in part or in whole, for the benefit of any Defendant; 3) in the actual or constructive possession of any Defendant; or (4) owned or controlled by, in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant.

    B. Opening or causing to be opened any safe deposit boxes, commercial mailboxes, or storage facilities titled in the name of any Defendant or subject to access by any Defendant, except as necessary to comply with written requests from the Receiver acting pursuant to its authority under this Order.

    C. Incurring charges or cash advances on any credit, debit, or ATM card issued in the name, individually or jointly, of any Corporate Defendant or any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant or of which any Defendant is an officer, director, member, or manager. This includes any corporate bankcard or corporate credit card account for which any Defendant is, or was on the date that this Order was signed, an authorized signor.

    D. Cashing any checks or depositing any money orders or cash received from consumers, clients, or customers of any Defendant.

The assets affected by this Section include: (1) all assets of Defendants; and (2) assets obtained by Defendants after this Order is entered if those assets are derived from any activity that is the subject of the Complaint in this matter or that is prohibited by this Order. This Section does not prohibit any transfers to the Receiver or repatriation of foreign assets specifically required by this order.

(Prelim. Inj. 6:22–7:24, ECF No. 64).

Defendants move the Court for an order to modify the preliminary injunction to allow them to access funds for their living expenses and legal fees and costs. Specifically, Defendants request the following amounts:

(1) $30,195 in monthly expenditures for Mr. Bennett;

(2) $26,680 in monthly expenditures for Mr. Selb;

(3) $92,818.01 to Snell & Wilmer for outstanding amounts due; and

(4) $45,000 a month to Snell & Wilmer for future/ongoing litigation fees and costs.

(Mot. Modify 8:6–9, ECF No. 57).

## II. LEGAL STANDARD

In civil cases where a district court has frozen a party's assets, the court has discretion to release funds for the purpose of paying attorney fees or living expenses. *Commodity Futures Trading Comm'n v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995). When reviewing district courts' discretionary decisions to release frozen funds, the Ninth Circuit has "recognized the importance of preserving the integrity of disputed assets to ensure that such assets are not squandered by one party to the potential detriment of another." *FSLIC v. Ferm*, 909 F.2d 372, 374 (9th Cir. 1990).

## III. DISCUSSION

In cases like this, district courts consider the following factors in determining whether to release frozen funds for legal fees and living expenses: (1) "the likelihood that plaintiff will prevail on the merits"; (2) "whether defense counsel was aware of the possibility that the court might deny or limit attorney fees"; (3) "the availability of assets for consumer redress"; (4) "a defendant's access to alternative assets"; and (5) "the reasonableness of the funds requested for legal fees and living expenses." *Fed. Trade Comm'n v. Johnson*, No. 2:10-CV-02203-RLH-GWF, 2011 WL 13249477, at *2 (D. Nev. June 17, 2011) (citing *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989)). Although this list is not exhaustive, it is helpful to guide

the Court's analysis. *See Johnson*, No. 2:10-CV-02203-RLH-GWF, 2011 WL 13249477, at *2.

### A. Likelihood of Success on the Merits

In exercising its discretion, the Court must take into account Plaintiffs' probable success on the merits of its claim. *World Wide Factors, Ltd.*, 882 F.2d at 346. The Court previously evaluated the merits of this case in its orders granting Plaintiffs' Motion for TRO and Motion for Preliminary Injunction. In those Orders, the Court found that Plaintiffs were likely to succeed on the merits of their claims. Accordingly, this factor weighs against modifying the preliminary injunction.

### B. Defense Counsels' Awareness of the Asset Freeze

"A district court may presume that attorneys who are aware of a defendant's asset freeze will also know that the court has discretion to approve or deny a release of frozen assets to pay attorney fees." *Johnson*, No. 2:10-CV-02203-RLH-GWF, 2011 WL 13249477, at *2 (collecting cases). Here, the Court can easily deduce that attorneys Bradly Austin, Benjamin Reeves, and Blakeley Griffith were aware, or should have been aware, of the asset freeze prior to agreeing to represent the Defendants in this case.[2] The Court issued the TRO on October 7, 2025, and set a preliminary injunction hearing. Three days later, Plaintiffs served the TRO on Defendants' financial institutions subjecting Defendants to the asset freeze. (Resp. 6:24–25, ECF No. 63). Bradley Austin and Blakeley Griffith then entered their appearances on October 17. (Not. Appearance, ECF No. 35). Benjamin Reeves filed a Motion/Verified Petition to Practice Pro Hac Vice on October 23 designating Blakely Griffith as local counsel. Thus, the Court concludes that Defendants' counsel assumed the risk of not getting paid which weighs against modifying the preliminary injunction.

---

[2] Defendants do not respond to Plaintiffs assertion that defense counsel was aware of the asset freeze. (*See generally* Reply, ECF No. 65).

### C. Availability of Assets for Consumer Redress

When a defendant's frozen assets are insufficient to cover the potential claims, a district court is within its discretion to deny a fee application. *Noble Metals Int'l, Inc.*, 67 F.3d at 775 (affirming the district court's decision to deny attorney fees because the record demonstrated that "the frozen assets fell far short of the amount needed to compensate" aggrieved parties). "Furthermore, if the receiver's estate is not large enough to pay all the claims against it, the court must essentially decide whether the alleged victims or defense counsel deserves the money more." *Johnson*, No. 2:10-CV-02203-RLH-GWF, 2011 WL 13249477, at *2 (citing *FTC v. Sharp*, 1991 WL 214076, at *1 (D. Nev. Jul. 23, 1991)). Plaintiffs state that records from payment processors and consumer financing companies show that, since February 2022, Defendants have taken in more than $77.7 million of ill-gotten revenue. (Resp. 7:9–11); (*see* Cordova Decl. ¶ 10, Pls.' Ex. 434 to TRO, ECF No. 49-3). Additionally, a "Company Plan" prepared in early 2025 and found on Defendant Selb's desktop computer includes an estimate that Defendants have taken in at least $153,683,015.66 of revenue since 2018, which Plaintiffs argue was ill-gotten. (Resp. 7:15); (*see* Company Plan at 3216, Pls.' Ex. 610 to Resp., ECF No. 63-1).

Under the preliminary injunction, its estimated that the Court has frozen approximately $10.5 million in assets held at financial institutions. (*See* Tyndall Suppl. Decl. ¶3, Pls.' Ex. 594 ¶ 3, ECF No. 47-3). Although this amount does not take into account Defendants' unliquidated assets, the amount available to satisfy consumer injuries is not enough to cover the potential liability. Defendants request access to $92,818.01 to pay for outstanding attorneys' fees and costs, $45,000 a month for future fees and costs, as well as sizable monthly living expenses. (Mot. Modify 8:6–9). Under these circumstances, it would be inappropriate to pay the requested amounts. *See Johnson*, No. 2:10-CV-02203-RLH-GWF, 2011 WL 13249477, at *3

(finding the same under similar circumstances). Doing so right now could leave consumers without sufficient assets for redress—an outcome that runs contrary to the Court's directive "to preserv[e] the integrity of disputed assets to ensure that such assets are not squandered by one party to the potential detriment of another." *Ferm*, 909 F.2d at 374. Accordingly, this factor weighs against modifying the preliminary injunction.

### D. Defendants' Access to Alternative Assets

"Another important consideration for a district court in determining whether to release frozen assets is the defendant's availability of alternative assets." *Johnson*, No. 2:10-CV-02203-RLH-GWF, 2011 WL 13249477, at *3 (citing *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1032 n.10 (7th Cir. 1988)). Plaintiffs argue that Defendants have access to alternative assets. First, Plaintiff contends that Bennett may have access to funds through his girlfriend (with whom he resides), because Bennett transferred $83,333 to her, as "prepayment of child support" on September 30, 2025. (Resp. 8:8–10); (*see* Tyndall Fourth Decl. ¶ 8(e), Pls.' Ex. 620 to Resp., ECF No. 63-1). In the past year, Bennett also transferred $32,000 to his girlfriend for "pregnancy support," "support," and "gifts." (Tyndall Fourth Decl. Pls.' ¶ 8(b)–(c), Ex. 620 to Resp.). And, in April 2025, Bennett gifted her jewelry that he valued at $80,000. (*Id.* ¶ 8(d)). Plaintiffs speculate why Bennett cannot use the money he gifted to his girlfriend to cover baby supplies, diapers, formula, and other childcare expenses. (Resp. 8:12–16).

Additionally, Plaintiffs point out that Defendant Selb receives $2,100 per month in social security payments and has transferred approximately $950,000 to his son, Justin Selb over the past two years. (*See* Tyndall Fourth Decl. Pls.' ¶ 10–11, Ex. 620 to Resp.). Plaintiffs appear to question why Selb cannot supplement his social security income with support from his son or another source. (*See* Resp. 8:18–20). Lastly, Plaintiffs argue that Defendants may obtain lawful employment and their choice not to undercuts their request to unfreeze funds.

1  (Resp. 8:21–25 (citing *FTC v. IAB Marketing Associates, LP*, 972 F. Supp. 2d 1307, 1314 (S.D. Fla. Sept. 18, 2013) ("Absent persuasive evidence to the contrary, the Court can conclude only that [Defendants] are capable of working to support their basic necessities."))).

In reply, Defendants argue that the prior funds transferred to Bennett's girlfriend for the child are controlled by her in a separate account, and Bennett is unable to retrieve those funds. (Reply 6:10–12).  Moreover, Defendants point out that Selb's social security payments are deposited into an account that remains frozen under the preliminary injunction. (*Id.* 5:23–25). Similarly, Justin Selb's bank account has also been frozen under the preliminary injunction so Selb cannot access the funds Plaintiffs reference. (*Id.* 5:26–6:3).  Defendants further inform the Court that they are currently evaluating lawful employment options but "it is extremely difficult to find suitable employment with the asset freeze, the employment restrictions under the TRO and now preliminary injunction, and the lawsuit pending." (*Id.* at n.5).

Accordingly, the record reflects that Bennett may not have access to alternative assets except for obtaining employment, and Selb would have access to alternative assets if his social security payment was not in a frozen account, his son's bank account was unfrozen, and he obtained employment.  Because Plaintiffs argued that Selb could supplement his social security payments with support from his son, Justin, the Court finds it appropriate to allow Selb to access his social security payments and unfreeze Justin's bank account.  However, the Court is unpersuaded by their argument that it is difficult to find suitable employment.  Thus, the Court concludes that Defendants can work to support their basic necessities, and this factor ultimately weighs against modifying the preliminary injunction beyond the social security payment carveout and unfreezing Justin Selb's bank account.

### E. Reasonableness of the Requested Funds

For a defendant to receive access to frozen funds, a district court must determine that the funds be used solely for fees which are "reasonable." *Ferm*, 909 F.2d at 374; *see also World*

*Wide Factors, Ltd.*, 882 F.2d at 348.  The Court separately addresses the reasonableness of the requested attorneys' fees and living expenses.

### 1. Attorneys' Fees and Costs

Selb and Bennett request $92,818.01 for outstanding amounts due and a monthly recurring payment of $45,000 for possible future expenses.  But counsel Austin's Declaration and Defendants' Reply do not include any real detail regarding either the outstanding invoices or the anticipated ongoing monthly legal fees and costs.  The Court cannot ascertain the reasonableness of Defendants' attorneys' fees and costs request without more information such as an itemization of the costs incurred, hours worked, and rates charged.  Accordingly, Defendants fail to meet their burden of establishing the reasonableness of the requested attorneys' fees and costs.

### 2. Living Expenses

To determine the reasonableness of requested living expenses, a district court must be comfortable that the requested funds involve necessities and would not support luxuries or a lavish lifestyle. *See, e.g., SEC v. Private Equity Mgmt. Group, Inc.*, No. 09-2901, 2009 WL 2058247, *4 (C.D. Cal. July 9, 2009) (finding that a defendant's requests for living expenses was "facially unreasonable" because he asked for an amount that would fund "a lavish lifestyle" including owning multiple homes and cars); *SEC v. Duclaud Gonzalez de Castilla*, 170 F. Supp. 2d 427, 430 (S.D.N.Y. 2001) (denying defendant's request for living expenses that included money for a nanny, housekeeper, handyman, and nurse).

Defendants argue that their requested living expenses are reasonable because they are largely attributable to fixed monthly costs. (Mot. Modify 7:15–16).  But Defendants' requested living expenses are facially unreasonable because they support a lavish lifestyle rather than necessities.  Bennett requests access to $30,195 per month to pay for his monthly expenses and Selb requests $26,680 per month.  Their purported budgets appear basic—although high—at

first glance, however, a peak into the record suggests the budgets contain luxury spending requests.

Beginning with Bennett, according to his financial disclosures, he owns his 2022 Mercedes-Benz G class SUV outright, (Tyndall Fourth Decl. Pls.' ¶ 9, Ex. 620 to Resp.), but his budget request includes $2,000 per month for a "car lease," (Bennett Budget at 2, Ex. 2 to Mot. Modify, ECF No. 57-2). Plaintiff argues that this suggests that Bennett seeks to maintain a second car, which is not a necessity, and likely contributes to his significant monthly car insurance payment ($1,500) and monthly fuel costs ($450). (Resp. 9:18–20). Defendants reply that the leased vehicle has been returned and they no longer seek that budget item, but they make no mention of a reduction in the car insurance or fuel costs now that Bennett only maintains one car. (*See* Reply at n.3). As another example, Bennett seeks $2,855 for his monthly water bill. (Bennett Budget at 2, Ex. 2 to Mot. Modify). Plaintiffs posit the source of this high bill is likely his home's private pool with a waterfall, which they argue is not a necessity. (Resp. 20:22); (*see* Tyndall Fourth Decl. ¶ 3(a)–(c), Ex. 620 to Resp.). Indeed, a pool is a luxury. The Court further finds Bennett's requests unreasonable because he asks for funds to support a residence that requires a $14,424 mortgage payment—nearly 50% of his purported living expenses.

As for Selb, he seeks $1,233 for a car payment. (Selb Budget at 2, Ex. 3 to Mot. Modify, ECF No. 57-3). Selb's financial disclosures show that Selb owns three Teslas outright but has a $50,000 loan on his fourth Tesla. (Tyndall Fourth Decl. ¶ 13, Ex. 620 to Resp.). As stated above, a second car is not a necessity, let alone a fourth. *See Private Equity Mgmt. Group, Inc.*, No. 09-2901, 2009 WL 2058247, at *4. Selb's budget also requests $13,497 (nearly 50% of his purported living expenses) to maintain his home in the Hollywood Hills neighborhood, which the Court finds unreasonable. (Selb Budget at 2, Ex. 3 to Mot. Modify). In sum, Defendants' requested living expenses are facially unreasonable and weigh against

modifying the preliminary injunction.

### F. Request to Withdraw

Lastly, the Court turns to Defendants' argument to allow defense counsel to withdraw. LR IC 2-2 provides that "[f]or each type of relief requested or purpose of the document, a separate document must be filed and a separate event must be selected for that document." Here, Defendants request two types of relief in the same motion: (1) to modify the preliminary injunction, and (2) to allow counsel to withdraw if modification is denied. Accordingly, the request to withdraw as counsel is DENIED without prejudice.

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that Defendants Tyler Bennett and Terrance Selb's Motion to Modify Preliminary Injunction Order, (ECF No. 57), is **GRANTED, in part,** and **DENIED, in part**. It is granted to the extent that Selb shall be given access to his monthly social security payments and Justin Selb's joint Wells Fargo account ending in 9793 shall be unfrozen immediately. The Motion is denied as to all other modifications sought and defense counsels' request to withdraw.

**DATED** this __11__ day of December, 2025.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT